·Ex parte McLEOD.

(District Court, N. D. Alabama, S. D.   February 13, 1903.)

**1. CONTEMPT—ASSAULT ON OFFICER OF COURT.**
As courts can exercise judicial functions only through their judicial officers, an assault upon a judicial officer because he has discharged a judicial duty is necessarily an attack upon the court, for what it has done in the administration of justice.

**2. SAME.**
It is vital to the welfare of society that courts which pass upon the life, liberty, and property of the citizen be free to exercise their reason and conscience unawed by fear or violence; and the highest considerations of the public good demand that the courts protect their officers against revenges induced in consequence of the performance of their duties, as well as violence while engaged in the actual discharge of duty.

**3. SAME.**
It is a high contempt of court to seek to punish a judicial officer for his official acts, elsewhere than before a constituted tribunal of impeachment, and the offense culminates in its malignity toward the court when its officer is assaulted for judicial acts by one who has been ·arraigned before him.

**4. SAME—WHAT CONSTITUTES.**
An assault upon a United States commissioner because of past discharge of duty is a contempt of the authority of the court, whose officer the commissioner is, in the administration of criminal laws, although no proceeding against the offender was then pending, and the commissioner was not at the time in the performance of any duty.

**5. SAME—POWER TO PUNISH.**
Legislation on this subject reviewed. Section 725 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 583] *held* to take away the common-law power of federal courts to punish criticism of judicial acts, or publications which amount to no more than libels upon their officers, but not to deprive those courts of the power to punish summarily, as for a contempt, an assault upon a court officer while yet in office, induced by his performance of duty in a past case.

**6. SAME.**
Courts will punish contempts of their authority only when the ends of justice will be best subserved thereby.

(Syllabus by the Court.)

## On Rule to Show Cause against Punishment for Contempt.

A. N. McLeod was indicted on the 15th of March, 1902, under section 5399 of the Revised Statutes [U. S. Comp. St. 1901, p. 3656]. The indictment charged, in substance, that McLeod, after examination, upon a charge of violating section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676], before Commissioner Randolph, was on the 20th day of June, 1900, held to answer before the next·circuit and district courts of the United States for this division and district, and that on the 30th day of October, 1900, McLeod, "well knowing that Randolph was such commissioner," etc., "went upon the highway, and unlawfully did threaten and assault the said G. B. Randolph, the said officer as aforesaid, for the reason that the said Randolph, as such officer, had required the said McLeod to execute bond for his appearance," etc. The next sitting of the grand jury, after the assault, was on the first Monday in March, 1901. It adjourned without taking action. This indictment was found a year afterwards, and more than 16 months after the assault. The case came on for·trial at the September term, 1902, when the defendant interposed demurrers on the ground that the offense charged was not indictable under the laws of the United States. During the argument the district attorney stated that, if the demurrers were sustained, he would ask a rule requiring the defendant to show cause why he should not be punished

for contempt, and the court replied that it would determine in that event whether the offense charged constituted a contempt. The demurrers having been sustained (United States v. McLeod [C. C.] 119 Fed. 416), the court announced its conclusion as to the contempt feature at a subsequent day of the term.

Thos. R. Roulhac, U. S. Dist. Atty., for U. S.
Knox, Blackman & Acker, opposed.

JONES, District Judge (after stating the facts as above). The evil example of the offender, and the improper inferences the lawless may draw from the inability to punish him by indictment, make it a duty to inquire whether the assault upon the commissioner because of past discharge of duty constitutes a contempt of the authority of the court, which should be punished, to prevent a repetition of such offenses in the future. A right understanding of the things which lie at the root of this matter is so vital to the good of society that full discussion cannot be out of place.

Civilized society abhors the arbitrament of private or interested force. It sets up its own tribunals to determine whether there is any reason for exerting the forces of society in the settlement of disputes, and, if so, in whose favor, and to what extent. The reason and conscience of officers called "judges" wield and direct the awful power of administering justice, which in so many ways controls the destinies of men. Violence to punish the free exercise of the reason and conscience of such tribunals is a blow at all order, and strikes at the very existence of justice. Separated from its officers, the court "is invisible, intangible, and exists only in contemplation of law." It "lives and moves and has its being," only in the acts and personality of living men. The ideal thing called the "court" is beyond the reach of force or fear or fraud. Bearing in mind what the court is, and how it is constituted, it is unreasonable, in the extreme, in seeking the principle for ascertaining and preventing obstructions to the justice the tribunal administers, to insist that this legal abstraction, which can neither breathe nor stir save in the bodies of living men, can be dissevered, for any practical purpose, in a matter of this kind, from the only personality in which it can exist as a living force. What reasoning being can deny that assaults upon court officers, because they discharge or have discharged their duty, are subversive of the independence of courts, and destructive of their authority and usefulness? Why are officers protected, if not to safeguard the administration of justice? There is generally no reason for protecting an officer as to the discharge of duty, which does not apply with equal force as well after it is done as while it is being performed. What a man fears may happen to him in the future because of doing his duty, if contemplated at the time the duty is being considered, may, and generally does, influence the discharge of that duty. The desire for vengenance frequently arises only after the duty is performed, because of its performance, creating greater need for protection to the officer than while he is executing the duty. In Divine and human laws the effective means relied on to restrain the acts of men is to hold up before their eyes the consequences which may result from their acts. Will the ordinary officer discharge his duty, fearlessly and unawed,

against the powerful, the vicious, and the desperate, when he knows that, the moment the duty is done, the power he serves will withdraw its protection, and leave him naked to the vengeance his act arouses? Will the lawbreaker dread. to give loose rein to his passion, when he feels that the court cannot or will not punish assaults upon its officers because of past discharge of duty?

So firmly is recognition of the truth imbedded in our jurisprudence, that officers should be protected from improper consequences of discharge of duty, that it has always shielded judicial officers, on the highest considerations of the public good, from being called in question in civil actions for things done in a judicial capacity, even when corruptly performed. Hamilton v. Williams, 26 Ala. 529; Busteed v. Parsons, 54 Ala. 403, 25 Am. Rep. 688. The reason is nowhere as well stated as by Chief Justice Kent in the memorable case of Yates v. Lansing, 5 Johns. 282, where he says:

"Whenever we subject the established courts of the land to the degradation of private prosecution, we subdue their independence and destroy their authority. Instead of being venerable before the public, they become contemptible, and we thereby embolden the licentious to trample upon everything sacred in society, and to overturn those institutions which have heretofore been deemed the best guardians of civil liberty."

Greater still must be the sweep of the evil, if judicial officers can with impunity be subjected, without resort to any court, to responsibility for judicial acts, and punished therefor by private vengeance, administered by persons who in the past have come in harsh contact with their power. Who would have any respect for the authority of a court whose judge, the moment he left the courthouse, could be subjected, with impunity, to insult and assault because of acts done in his judicial capacity while on the bench? Is it in the power of any person, by insulting or assaulting the judge because of official acts, if only the assailant restrains his passion until the judge leaves the court building, to compel the judge to forfeit either his own self-respect and the regard of the people by tame submission to the indignity, or else set in his own person the evil example of punishing the insult by taking the law into his own hands? If he forbear for the time, and resort to the criminal law, the remedy is hardly better than the wrong, since then he must become a private prosecutor in some other court, and depend on it to vindicate the independence of his own court. Unless the court, whose officer he is, can and will punish such conduct and acts towards the person of the judge, when past discharge of duty is the motive for the indignity, the judge must submit to some of these alternatives; and any of them degrade his office, and bring the administration of justice into scandal. No high-minded, manly man would hold judicial office under such conditions. Justice would depend not alone on the learning and integrity of the judge. His ability and will to fight unto death, even in a street brawl, would be equally, if not more, important. Are not these things of grave concern to the court, which can exercise its functions of administering justice only through the judge who is thus badgered, assaulted, and intimidated because of judicial acts?

When the duty and power of the court to deal with such evils are

considered in the light of principle and reason, the real question is not where the indignity occurred, but whether it related to the discharge of duty, and has the evil consequences in the administration of justice to which we have adverted. If these results follow, it is not at all material, so long as the judge is assailed for official acts, where the judge is at the time of the assault, nor whether he is then engaged in the discharge of any duty, nor whether the court is then sitting, nor whether the assault was with reference to a past, instead of a pending, case. These things are not of the essence of the offense and evil. Viewing the offense on principle, the sitting of the court is material only in determining when its power can be put in motion against the offender. The evil is that the judge has been held to accountability for his judicial acts, and punished, contrary to the law, because he has performed them. That acts like this, which degrade the judicial office, unfit judicial officers for calm deliberation, awe them in the exercise of their functions, and undermine their independence, must recoil fearfully on the orderly and decent administration of justice, cannot be denied. It is therefore a high contempt of court for any one to seek to punish the judge for his judicial acts, elsewhere than before a constituted tribunal of impeachment. The offense culminates in its malignity toward the court when the judge is actually punished for judicial acts, by personal violence at the hands of one who has been arraigned before him.

After diligent search, no reported case has been found in this country which covers the precise question here involved. There is a very learned and thorough discussion, to which little can be added, of the general principles which govern cases of this sort, by the general court of Virginia, in Commonwealth v. Dandridge, 2 Va. Cas. 408. That case and this differ, however, in some important features. There the judge was insulted about a suit against Dandridge's surety, which was still pending before the court. The hour had arrived for its sitting, and the judge was on his way to the courtroom, and near there, to take his place on the bench, when Dandridge denounced him for past conduct in the case, at a former term. Here, no proceeding whatever in which McLeod was interested was pending either before the commissioner, or the circuit or district court, at the time McLeod assaulted the commissioner. The latter was not then in the discharge of any duty, as was the judge in the Virginia court. In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55. In Dandridge's Case there was insult only by words and manner. Here there was an attempt to do personal violence. Judge Dade, who delivered the main opinion in Dandridge's Case, said:

"The reason why such indignities put upon the persons of judges when off the bench were punished summarily as contempts was, to use the language of Blackstone, 'because they demonstrate that gross want of regard and respect which, when courts of justice are once deprived of, their authority so necessary to the good of the kingdom is entirely lost among the people.'"

Immediately following, Judge Dade further says:

"Nor, in this particular, and for this end, is it of the least importance whether the contumely is used in open court, at the moment the occasion occurs, or at the moment afterwards, when the crier has proclaimed the adjournment, as the judge descends the steps of the bench, or those at the

courthouse door. The only real question in either case is whether it is his official conduct for which he is challenged and insulted."

He then adds:

"It was, however, very necessary for the defendant to draw this distinction, for which his counsel contended, if possible, because it was foreseen that there was no reason for protecting from insult the person of the judge in court on account of his official conduct which did not equally apply to protection out of court on the same account. It would have been shifting the ground to maintain that the insult in court was punishable because it interrupted the business of the court, because, besides its being sometimes of such a sort as not to produce this effect, it is referable in that respect to another head of attachment, viz., that for obstructing the power of the court."

Judges White and Parker rendered concurring opinions to the same effect. Judge Parker said:

"If any of the officers of justice are so threatened and insulted for their conduct as to make it apparent that such attacks, if permitted, would have influence on the general administration of the law, the offender is obnoxious to punishment on every principle of justice and expediency."

The conclusion that Dandridge was guilty of a contempt was unanimous, the ten judges concurring in the judgment. Commonwealth v. Dandridge, supra, is cited approvingly on the general doctrine of contempts, though not as to this precise point, by the supreme court of the United States, in Ex parte Terry, 128 U. S. 304, 9 Sup. Ct. 77, 32 L. Ed. 405.

It is said that punishment, as for a contempt, of an assault upon the officer because of past discharge of duty, is inconsistent with the spirit of our institutions; that such an assault is nothing more than an assault upon a private person, and can only be dealt with as such; that punishment under the contempt power of the court of such an offense invests the person of the judge with privileges at war with the spirit of equality between citizens which our form of government maintains; and that it is, therefore, without the power of the courts in this country to treat any assault upon the officer, no matter what the motive, when he is not actually engaged in the discharge of any duty, as a contempt of court. The necessities of government require, in many instances, that a difference be made between public servants and private citizens. For instance, it is for the public good that a representative shall not be questioned, elsewhere than in the house of which he is a member, for words spoken in debate. Such a privilege is the prerogative of the whole people; but it can only be made effective by giving protection to the individual who represents them, when it would not be accorded under like circumstances if he were acting in a mere private capacity. So it is of many statutory and constitutional privileges which are created for the public good, and not for the sake of the individuals who hold official positions. An assault upon a judicial officer which grows out of official conduct necessarily differs from an assault upon a private individual about a private matter. The consequences to society are not the same. One affects the administration of justice. The other does not. The motive of the assault, under every system of laws, determines the gravity of the offense. An assault upon one who is a judge, about a matter dis-

connected from his official duties, is not of concern to the court, for it does not affect the administration of justice, and does not differ in any wise or in any degree, in its legal aspects, at least, from an assault upon any other individual. It would be a bald usurpation of authority for the court to attempt to pervert the contempt power to punishing an act which in no way concerns the administration of justice. The case here grows out of an assault upon a judicial officer because of past discharge of duty,—a thing which gravely affects the administration of justice. Justification of punishment in such a case, as for a contempt, is found in the consideration that an assault upon a judicial officer for such a reason attacks the great prerogative of the people, to have and enforce the fearless administration of justice.

It is vital to the enjoyment of civic rights and free institutions that tribunals which pass upon the life, liberty, and property of the citizen, and his relations to government, and its power over him, shall be and remain uncorrupted, unawed, and independent. Hence the power to punish summarily contempts of their authority, to use the language of Blackstone, "is an inseparable attendant of every superior court." From time immemorial, in the mother country, the courts have exerted the power not only to compel obedience to their commands, and to preserve order and decorum in their presence, but also to crush unlawful influences of any kind which tended to undermine their authority, or to corrupt or awe their officers in the discharge of duty, or assailed in any way those under the immediate protection of the court. This power was exerted to put down evils which tended to scandalize the general administration of justice, as well as acts which affected particular cases before the court. Courts allowed no violent intermeddling with persons concerned in the administration of justice, whether the force was brought to bear upon them while in office, and discharging their duties, or when out of office, because they had discharged their duties. "Instances," to use the language of a learned judge, "were frequent where men have been fined and imprisoned for menacing and assaulting their adversaries for suing them, the counsel or attorney for bringing suit, the witness for his testimony, the juror for his verdict, and even the jailer for keeping him in custody." Courts uniformly regarded these things quite as vicious as assaults upon officials while actually engaged in the discharge of duty. They punished such "misbehavior" in order to curb an evil which, if let alone, weakened or threatened fidelity to trust of every person who then assisted or might thereafter assist in the administration of justice. This was the settled rule in the courts of the mother country. When the colonists came to our shores they brought with them the heritage of the Magna Charta, the writ of habeas corpus and the right of trial by jury. They also brought with them the principle of administering justice by courts armed with ample power summarily to suppress all manner of evils which threatened their independence, or assailed the freedom and impartiality of their officers in the administration of justice. These attributes, at the common law, followed the courts set up here, and inhered in their very constitution. At the common law, it was a contempt to publish criticisms of the acts of the court, and still more so to assail their officers by

physical force because of the past performance of official duties. When, upon the separation from the mother country, the colonists set up freer institutions, based on the inalienable right of the people to govern themselves, and the conviction that the people could be safely trusted with all their own powers; when it was declared that treason against the United States shall consist only in levying war against them, or in adhering to their enemies and in giving them aid and comfort; and when congress was prohibited from making any law abridging the freedom of speech or the liberty of the press, or the right of the people to peaceably assemble and petition for redress or grievances,—it followed inevitably, though not readily acknowledged at first, that government could not suppress or regulate these rights to the extent practiced in less enlightened ages in the mother country, and in the earlier periods of the government here, and that all powers of government, whether exerted by the legislative, judicial, or executive department, to suppress criticism or even libels upon the government, were hostile to the spirit of our free institutions. Profound distrust of the ability of the people to govern themselves, alone, made it possible to enact the alien and sedition laws, which expired by their own limitations, and were ever afterwards condemned by the aggressive power of a dominant public opinion, which proclaimed as a maxim of government that greater danger to liberty and free institutions lurked in any power to curb the right of free speech and liberty of the press, than from any abuses which might result from leaving them untrammeled. This public opinion, which has been acquiesced in by all departments of the government and gone unchallenged for a century past, has pronounced a construction of the constitution in this respect which has silently incorporated itself into that instrument. The purpose of the constitutional command as to "a speedy and public trial by an impartial jury" would fail of fruition unless what is done in the courts is made known to the people, and, when improperly done, is held up for their condemnation. The right of a court to punish, as for contempts, criticisms of its acts, or even libels upon its officers, not going to the extent, by improper publications, of influencing a pending trial and usurping direction and control of the issue, would not only be dangerous to the rights of the people, but its exercise would drag down the dignity and moral influence of these tribunals. Such criticism is the right of the citizen, and essential not only to the proper administration of justice, but to the public tranquillity and contentment. Withdrawing power from courts to summarily interfere with such exercise of the right of the press and freedom of speech deprives them of no useful power. Liberty of the press and freedom of speech are not more favored than the right of the citizen to an impartial trial in the courts of the land. These are correlative rights, and the freedom of the press cannot be perverted to frustrate the right to a fair and impartial trial. According to the prevailing and better opinion in the state courts, exercise of the liberty of the press, when it goes to the unlawful extent of injecting its influence into the trial of a particular case, so as to affect the issue, may still be punished as a contempt, notwithstanding provisions found in several state constitutions which are the equivalent, in this respect,

of the commands of the constitution of the United States regarding the liberty of the press and freedom of speech.

The independence of the judiciary is a cherished principle in our plan of government. Courts in this country strike down legislation and restrain executive acts affecting the life, liberty, and property of the citizen to an extent unknown in monarchical countries, where courts have less authority and play a humbler part in protecting the citizen against the aggressions of government. There is not, therefore, and cannot be, any incompatibility between our institutions and the possession by the courts of the fullest power to vindicate their authority and preserve their independence against physical assaults, directed against their officers because of past discharge of their duties. Liberty of the press and freedom of speech regarding government do not include the right to resort to violence against its officers.

Whether or not section 725 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 583] deprives federal courts of the power to punish, as for contempt, improper publications made to influence the trial of a pending case, and coerce or control the judgment of those intrusted with the duty, is not at all involved in the question before the court. It is to be borne in mind that this section of the Revised Statutes was induced by the acquittal of District Judge Peck, who was impeached for imprisoning an attorney for a criticism of one of his decisions, after the case had ended in his court. The acquittal was largely due to the consideration that the common law authorized the judge to treat such criticism as a contempt of court, and that there was not sufficient evidence in other respects to show that the judge had acted corruptly or maliciously. Public opinion, which had not forgotten the passions aroused by the alien and sedition laws, and the partisanship of judges in their enforcement, looked upon the act of Judge Peck as an attempt of the judiciary to revive the principles of these obnoxious laws, and to assert common-law powers which were inconsistent with our constitution and institutions. Congress intended by this statute to put an end to the power of any federal court to prevent, by punishment as for contempt, criticism of judicial acts or decisions, or even mere libels on individuals concerned in the administration of justice. The statute was drawn by Mr. Buchanan, one of the managers of the impeachment, who afterwards became president. It is doubtful, to say the least of it, whether any of the eminent lawyers in the congress which adopted this provision, taken from a similar statute in Pennsylvania, had in mind anything more than to prevent the punishment, as for a contempt, of exercises of the right of free speech and liberty of the press in criticising and denouncing judicial acts. It is questionable, to say the least of it, whether congress intended to take away from the courts the existing common-law power to punish, as for a contempt, improper efforts, in the guise of published statements or comments, pending the trial of a particular case, to secure judgment therein, in obedience to the dictates of passion or prejudice, or to thrust other ulterior considerations before the tribunal, against which justice and the law seeks to guard judge and jury in the trial and decision of causes. The changes to which we have adverted in no way touch

the power of the courts, under their contempt power, to deal with physical assaults upon their officers in resentment of their official acts. This power remains as at the common law, unless withdrawn by some statute of the United States. Whatever may be the power of congress to regulate this matter as regards the supreme court, which is created by the constitution, it is not doubted that it may regulate the exercise of the power by inferior courts.

Is the power to punish this "misbehavior" as a contempt taken away by any statute of the United States? The judiciary act of September 24, 1789, invested the courts of the United States with "power to punish by fine or imprisonment all contempts of authority, in any cause or hearing before the same." Of this statute the supreme court, in Re Savin, 131 U. S. 274, 9 Sup. Ct. 699, 33 L. Ed. 150, observed:

"The question whether a particular act constitutes a contempt, as well as the mode of proceeding against the offender, was left to be determined according to such established rules and principles of the common law as were applicable to our situation. The act of 1831, however, materially modified that of 1789, in that it restricted the power of the courts to inflict summary punishment to certain specified cases, among which was misbehavior in the presence of the court, or misbehavior so near thereto as to obstruct the administration of justice. Ex parte Robinson, 19 Wall. 505, 22 L. Ed. 205."

It is as true of the later statute, as of the first, that the question whether a particular misbehavior "in the presence of the court, or so near thereto as to obstruct the administration of justice," constitutes a contempt, "is left to be determined," as before, by the court. The later statute does not in any way attempt to define a contempt, save by the definition, so far as concerns this case, that it must be "misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice." Neither does the statute of March 2, 1831, "declaratory of the law concerning contempts of court," which, in its second section, creates the criminal offense "of corruptly, or by threats or force, obstructing or endeavoring to obstruct the due administration of justice therein," define what things amount to an obstruction to justice. So the questions of what "misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice," constitutes a contempt, and what constitutes an obstruction to the "administration of justice," are left, just as before, to be ascertained by the court; and, if such misbehavior fall within the definition above, it may still be punished summarily by the court as a contempt.

As we have seen, the chief purpose of the statute "declaratory of the law of contempts of court," approved March 2, 1831, which is now codified in section 725 of the Revised Statutes [U. S. Comp. St. 1901, p. 583], was to prevent the punishment, as for contempt, of what were really only the exercise of free speech and liberty of the press in criticising judicial officers and acts, and chronicling the doings of the courts. The inherent existing power which this act regulated included not only the means of doing harm in the respect stated, but also the means of doing good in other respects, by preventing acts subversive of the authority and independence of the courts, which weakened the administration of justice and brought it into scandal. In view of the beneficent purpose for which the power was used in

the latter respect, we cannot, in the absence of words forcing that conclusion, impute any design to congress, in dealing with an evil exercise of the power, to destroy also the existing right to exert this power for good, in upholding the purity and independence of the courts. The words do not demand such a construction, and to give them effect would deny powers very essential to courts in "the administration of justice."

It may have been thought by some that congress, having provided the punishment of obstructions to justice, in the second section of the act "declaratory of the law of contempts of court," now section 5399 of the Revised Statutes [U. S. Comp. St. 1901, p. 3656], intended that such acts should not fall within the "misbehavior" which can be summarily punished under the contempt power. The supreme court has held that the fact that such an offense is punishable by indictment does not "make that mode exclusive, if the offense is committed under such circumstances as to bring it within the power of the court under section 725 [U. S. Comp. St. 1901, p. 583],—when, for instance, the offender is guilty of misbehavior in its presence, or of misbehavior so near thereto as to obstruct the administration of justice." In re Savin, supra.

In one respect the act of March 2, 1831, is broader than the judicial act of September 24, 1789. The act of 1789, in its words, at least, confined the contempt power of the court "to contempts thereof" in "any case or hearing before the same." Under that act, to bring the "misbehavior" within the power of the court, when it did not occur in the presence of the court, the misconduct must relate to a "case or hearing before the same." The case must be pending "before" the court, not a case which is no longer "before" it, in consequence of having been decided or dismissed. The first section of the act of 1831 (now section 725) omits the words "contempts thereof" in "any case or hearing before the same," found in the act of 1789, and authorizes the punishment of "contempts of their authority" in "the presence of the court, or so near thereto as to obstruct the administration of justice." Under section 1 of the act of 1831 (now section 725 of the Revised Statutes), it is immaterial that the case is no longer "before" the court, if the misbehavior concerning it is "in the presence of the court, or so near thereto as to obstruct the administration of justice." It is only in this second section of the act of 1831, now constituting section 5399 of the Revised Statutes, that we find the words "therein," or "in any court of the United States," which are not contained in the first section, which regulates the contempt power only. The words "obstruct the administration of justice" are found in both sections. Why, when regulating the existing contempt power, in this carefully drawn statute, did congress, in the first section, dealing with the contempt power only, use the words "obstruct the administration of justice," and then, in the next section, which does not regulate the contempt power, and only defines crime, avoid the use of the general term "administration of justice," or, rather, qualify it by preceding the term with the word "due," and following it by the word "therein," so as to read, "obstruct the due administration of justice therein"? The words "obstruct the due ad-

ministration of justice therein," used in a penal enactment, necessarily limit the offense there denounced to cases "therein,"—in the court, still "before the same,"—and exclude past cases. They do not cover "misbehavior," which, though not directed to a particular case, affects all cases alike in the general administration of justice. The words "obstruct the administration of justice," in the first section, which is not penal, regarding a power to preserve the purity and independence. of the courts, and thereby promote the dispensation of justice, are broad enough to include not only improper acts in particular cases, but those which undermine the general administration of justice, as well.

In view of the history of this statute, and its studied discrimination in the use of words in the different sections, we cannot presume that congress, in regulating, in the first section, an existing power, the possession of which is of such vital importance to the objects for which courts are created, regarding misbehavior "so near to the court as to obstruct the administration of justice," used the term "administration of justice" in the same narrow sense in which it is employed in the subsequent section, creating an indictable offense against the administration of justice, which offense, by the use of the qualifying word "therein," is confined to misbehavior in particular cases pending in the court, and therefore does not include acts which tend to subvert the purity and independence of courts or scandalize justice, unless done in relation to a particular pending case. The ruling on the indictment in this case sharply illustrates the distinction. The assault here is a blow at the fearlessness and independence of judicial officers, and scandalizes the general administration of justice; yet it could not be punished by indictment under this second section of the act of 1831 (section 5399 of the Revised Statutes), because it did not relate to any pending case in court,—"therein."

Bearing in mind that congress, in the present statute, liberated the power so that it may deal with contempts—"misbehavior"—with reference to past as well as pending cases, if they fall within the contingencies prescribed, and presuming, as we must, that congress was desirous that the inherent power the courts then possessed, to preserve their purity and independence in the general administration of justice, should not be unduly shackled, there can be little doubt that congress deliberately rejected the employment of the word "therein," after the words "obstruct the administration of justice," in the first section, in order to avoid striking down the power to prevent evils which attack the administration of justice itself, and, by undermining the security and independence of its officials, bring it under suspicion and scandalize it in the face of the people, although, as here, the misbehavior does not obstruct justice in any particular case. The assault here was clearly an offense of that character. Violence done to the judge because of the discharge of duty may undermine his independence and constrain his judgment, and affect every subsequent case which comes before his court. The judicial mind which once yields and pronounces judgment according to, the dictates of force or fear, is degraded and impure. It will weaken again under the same influence, and successful exertion of the influence in one case will

beget other unlawful endeavors, with like results. Such a mind is not a fit source from which to seek justice in any case. So it is that such acts become obstructions to justice, which affect judicial fearlessness and independence in every case before the court. They thus fight against justice in the particular cases, as well as in its general administration.

What is meant by the words "so near thereto" has not been defined by judicial decision. In view of the evil intended to be suppressed, they mean not the place where the "misbehavior" is committed, but the power of the "misbehavior" to harm the administration of justice. If the force put in motion by the "misbehavior," at whatever place it is committed, assails or threatens the authority and independence of the court, then the "misbehavior" is "so near thereto" as to be punishable under this section. Myers v. State, 46 Ohio St. 473, 22 N. E. 43, 15 Am. St. Rep. 638. In Savin, Petitioner, 131 U. S. 269, 9 Sup. Ct. 699, 33 L. Ed. 150, the matter came under discussion; but the supreme court declined to decide whether the words "so near thereto as to obstruct the administration of justice" refer "only to cases of misbehavior outside of the courtroom, or, in the vicinity of the court building, causing such open or violent disturbance of the quiet and order of the court while in session as to actually interrupt the transaction of its business." In that case Savin attempted to bribe a witness in the witness' room while he was waiting to be called into the courtroom. His offense took place out of sight and hearing of the court, though the trial in which the witness was to testify was then going on. The judge did not know what transpired at the time, yet Savin was held to be guilty of "misbehavior in the presence of the court." In his opinion, Justice Harlan quotes approvingly Bacon's Essay on the Judicature, No. 57, where he says:

"The place of justice is an hallowed place, and therefore not only the bench, but the footpace, and the purprise thereof, ought to be preserved against scandal and corruption."

Justice Harlan adds:

"We are of opinion that, within the meaning of the statute, the court, at least when in session, is present in every part of the place set apart for its own use, and for the use of its officers, jurors, and witnesses, and misbehavior anywhere in such a place is misbehavior in the presence of the court."

If the inanimate things which are devoted to the use of justice are hallowed in the eyes of the law, at least when the court is in session, how much more so, in principle, must be the security against assaults, because of discharge of duty, of the person of the officer who orders and controls the administration of justice therein, no matter where he is. Is not the judge "so near" to the court that whatever unlawfully influences him unlawfully influences the court?

No useful purpose would be subserved by discussion of the distinction between contempts in faciæ curiæ, and constructive contempts which may be punished summarily by the court. There is a learned and instructive opinion on this subject, by Judge Hammond, in The United States v. Anonymous (C. C.) 21 Fed. 761. He says:

"It is quite clear that it is a mistake that all contempts not committed in the presence of the court are constructive only. The mere place of the oc-

currence may not be an absolute test of the question. It may depend on the character of the particular act in other respects, besides the place where it happened. When it takes the form of an assault upon the officer, as when he was beaten and made to eat the process of the court and its seal, as in Williams v. Johns, 2 Dickens, 477, the impediment to the even administration of justice may be quite as direct in its operation to that end, happen where it may, as if the party had ridden his horse to bar and dragged the judge from the bench and beaten him."

If the people of a distant locality, frenzied by opposition to a particular law, should band together to prevent a United States commissioner being stationed among them, and drive him away by force, the place of the occurrence would be immaterial, in determining the character of the offense, no matter how far distant from the sittings of the court. Such lawless acts would certainly not disturb the sittings of the court or interrupt the orderly dispatch of its proceedings; yet the direct effect, in law and morals, would be as obstructive of justice as if the same lawless assembly had snatched prisoners from the hands of the marshal, or kidnapped witnesses to prevent their going before the grand jury, or, for that matter, arrested the judge himself, when found miles away from the courthouse, and detained him by force, to prevent his holding the next session of the court. No one would doubt the power to punish such acts as misbehavior "so near to the court as to obstruct the administration of justice," for they arrest or disturb the powers of the court as effectually as when done in the very presence of the court. See In re Brule (D. C.) 71 Fed. 943.

What is said as to the judge of a court applies with equal force to persons who aid it in a judicial capacity in the administration of justice. Commissioners are important officers in the administration of criminal justice. Though they do not hold courts of the United States, they perform judicial duties. The district court appoints them. It assigns them to posts of duty, generally at a distance from the court. They are on duty, as regards matters pertaining to their office, though not actually engaged in holding an examination, while they remain at their posts in readiness to discharge their duties. These duties cannot be fearlessly performed if commissioners must seclude themselves in their offices. They have the right to go on the highways, free from fear of molestation on account of the discharge of duty, whether past or prospective. Certainly it is of concern to the court which appoints the commissioner, and the administration of that part of justice which is confided to him, that he be protected from violence and intimidation as to his fidelity to his trust. This he does not have, unless the court protects him against violence because of his having done his duty. He is, we repeat, an officer of the district court, and under its protection as to the discharge of duty. Whatever obstructs him or degrades him, and prevents fearless discharge of duty, necessarily obstructs justice in the court of final jurisdiction, one of the first steps of which must be taken by him in the examination, and holding offenders to answer in the district or circuit court. Assaults upon him, while he remains in office, because he has discharged its duties, are assaults upon a representative of the

court because he has borne true allegiance to the law and the court. If the lawbreaker may attack him as a representative, the court may defend him as a representative. It is true that the commissioner, as an individual, is under the protection of the state laws. Local authorities are sometimes unable to give him adequate and prompt protection. The state law takes no concern in the federal officer, as such, or in protecting his authority, or in preventing violence to him because he has discharged his duty. It is not an offense against the state to resist the authority of a federal officer. The government established by the constitution is not dependent on state laws for means to protect its officers in the discharge of duty. The executive may undertake this duty, instead of relying on the laws or officers of the state. In re Neagle, 131 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55. On the same principle, the court may do so in behalf of its officers, if it has any power it may lawfully exert to that end. How far the government will intrust the protection of its officers, in that behalf, to the laws of another government, which protect the officer as an individual only, is a matter of governmental policy. The fact that the laws of one government, operating to shield the individual only, may in that way furnish protection to the officer of another government, may be a reason why the latter power does not pass statutes of its own to shield its officers; but it does not touch its power to do so, or render it improper to rely on means of its own, instead of invoking the laws of another power. Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717. Whatever the reason for the omission to pass statutes against the evil now under discussion, it affords no reason why the court, if it has the power, ought not to exercise its authority to protect its officers against the evil.

It is not the duty of the court to notice every contempt. Many contempts may well be left to be rebuked by the good sense of the people, and the respect they entertain for the institutions of their country, without in any way impairing the authority of the court. Courts will punish for contempts only when the ends of justice will be best subserved thereby. The character of the offense charged here required the court to inquire fully as to it. The assault was committed nearly 16 months before indictment found. Three grand juries ignored the matter, if it was brought to their notice. The defendant has been prosecuted for the assault in this court and the state court. The animosities engendered by the assault, as the court is advised, have given place to kindly relations. The admonition to the defendant has been sufficient. The case and its discussion have brought home to those who might be disposed to repeat the offense, full realization that assaults upon officers because they have discharged their duties are blows at good government, degrading to those who indulge in them, which an outraged public opinion, as well as courts, will resent. Under these circumstances, it does not seem to the court that any public good will flow at this late day from punishing the offense. This conclusion renders it unnecessary to consider the interesting question whether the court, having timely notice of the offense, and allowing the first term at which it could be punished to pass without

noticing it, may punish the offense summarily after other terms have intervened, when the defendant has all the while remained openly within the jurisdiction.