# EX PARTE THOMAS D. MOTT, JR.
# EX PARTE HENRY F. HORD.
# EX PARTE FRANCIS H. DEXTER.
# EX PARTE ANTONIO SARMIENTO.

---

1. It is a contempt of court for attorneys to go before a committee of a local legislature, and there comment upon, and criticize the court regard-

---

Note.—*Contempt.*—For cases dealing with criticism of decision or opinion after case has been determined, as contempt, see note to Re Breen, 17 L.R.A.(N.S.) 572; as to personal criticism of, or insult to, court, be-

Ex parte Mott.

ing its rulings in cases that are still pending before it, especially when such attorneys are of counsel in some of the cases referred to.

2. Notwithstanding § 725, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 583, it is a contempt of court for attorneys to testify and criticize the court for its rulings in pending cases, before a legislative committee, especially when it is manifest that such action is intended to intimidate the court.

3. Quære: Whether or not the legislative privilege of attorneys who happen to be members of a legislative body protects them against citation for contempt or for unprofessional conduct for slanderously criticizing the court for its rulings in cases still pending before it, and in some of which they themselves are of counsel?

4. Since the enactment of § 725, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 583, courts of the United States, or courts having similar jurisdiction, are much more restricted as to their powers to punish for contempt than are local or state courts. In many instances judges of courts are left to their remedy by personal action for criminal or civil libel or slander like other citizens, where a jury trial can be had by the defendant.

5. Under our system of government, the three co-ordinate branches thereof — the executive, the legislative, and the juidcial—are each supreme and independent within their own respective spheres; neither has any right to encroach upon the duties or prerogatives of either of the others, but each owes to the other proper courtesy and respect. Therefore: The intermeddling of the local house of delegates in the affairs of the District Court of the United States for Porto Rico in the way of slanderous criticism of its judge for his action in cases still pending before the court is an inexcusable impertinence.

6. Attorneys owe to the court proper respect, and they owe this because of being officers of the court, in a higher degree, probably, than citi-

cause of decision, after determination of cause, as ground for contempt, see note to Re Hart, 17 L.R.A.(N.S.) 585; failure to appear or tardiness of attorney as contempt of court, see note to Ex parte Clark, 15 L.R.A.(N.S.) 389; as to want of due respect towards court in legal papers as ground for disbarment, see note to Re Robinson, 15 L.R.A.(N.S.) 525.

As to liability of publisher, as for contempt of court, for publishing an inaccurate report of a court decision, see note to Re Providence Journal Co. 17 L.R.A.(N.S.) 583.

zens at large.  Under their oath of office, all lawyers must maintain
towards the courts a respectful attitude, because judges are not wholly
free to defend themselves, and are peculiarly entitled to receive the
support of the bar against unjust criticism and clamor.

7. A so-called joint resolution passed by a bare majority of the house of
delegates of Porto Rico, and which was never transmitted to the
executive council or upper house of the assembly, is not a joint resolu-
tion of the assembly, and has no force or effect in law.

8. Quære: Whether, since the holdings of the Supreme Court of the United
States in White v. Nicholls, 3 How. 291, 11 L. ed. 602, members of a
local legislature, who, by their acts, insult and slander a Federal
judge, or one having such jurisdiction, may not be liable to citation
for contempt, or subject to actions at the hands of the judge individu-
ally for libels or slanders uttered in course of debate, or published in
their reports?

9. In contempt proceedings the court is not a party; there is nothing in
or about the issue that effects the judge in his own person, even
though the attack is directed at him individually; and his only con-
cern is that the law should be obeyed and enforced.

Opinion filed March 23, 1909.

RODEY, Judge, filed the following statement and opinion:

These four matters are rules against the several respondents
to show cause why they should not be severally reprimanded,
suspended, disbarred, or punished as for a contempt for certain
alleged unprofessional conduct of each of them, and certain
alleged contemptuous acts committed by them.

The acts complained of are that each of these parties, who are
attorneys, counselors, and proctors of this court, joined others,
and did, in the latter days of January, 1909, go before a so-
called committee of the local house of delegates of Porto Rico,
and there retried(?) several of their cases, and defamed this

Ex parte Mott.

court as an institution and its judge as a lawyer and an individual, and, in addition, severely criticized the court for its rulings and action in several cases that were then, and some of which are still, pending and undetermined before the court.

The position the court finds itself in is one of extreme delicacy, because of conditions existing on the island. Within the last four months several libel suits have been tried before us wherein certain editors of Spanish newspapers were defendants, and wherein the juries rendered verdicts against such defendants. Several damage and other suits were also tried, and the juries in like manner rendered verdicts against clients of some of these respondents. Within the last year or so a spirit of hostility has developed in the minds of certain leading politicians of the Unionist party against the organic law of the island, and especially against the provision making the upper house of the local assembly appointive instead of elective. In the minds of these few politicians and these persons who lost these law suits there also arose a feeling of deep hostility towards the Federal court as an institution. This latter feeling regarding the court did not manifest itself to any extent until the latter part of January, 1909,—about two months ago. The first open sign of it was when several native lawyers who happened to be members of the house of delegates, suddenly, while the court was absent and in session at Ponce, on the south of the island, introduced a resolution in the house at San Juan, setting out that the court had created a spirit of hostility on the island, and that a judge from Louisiana ought to be appointed to its bench, and that, if this could not be done, the court ought to be abolished. This resolution was referred out

Ex parte Mott.

to a committee, and the chairman of that committee advertised broadcast for everybody having anything to say against the court or its judge to come before it and make their statements. Sessions of this committee were held for several days and the respondents went before it, as stated, and committed the acts complained of. The matter created a great furor on the island, and the newspapers were filled with the "evidence" of these men and others, and with criticisms of the court as an institution and the judge as an individual, during several days, during which time practically nothing else was talked of on the island. Stenographic reports were taken of the statements made by the respondents before this committee.

The Bar Association of this court called a meeting and passed a set of very strong resolutions condemning the action of the respondents, and requesting that they be proceeded against for unprofessional conduct. In addition, thirty-seven out of the forty-three members of the bar practising before the court, unsolicited, at once signed and transmitted to the court a letter of indorsement, deploring and condemning the action of these respondents, and expressing the utmost confidence in the honesty, ability, and integrity of the present incumbent of this bench, for which we here freely make acknowledgment. When these resolutions of the Bar Association were submitted to the court, we demanded the names of the attorneys and a verified transcript of what they stated before this committee, which was shortly thereafter duly presented and filed. Rules and orders to show cause were thereupon issued against these several respondents, and with the rule there was served upon each a copy of the resolutions of the Bar Association, and a copy of the transcript of the alleged statements of each of them. At the

Ex parte Mott.

appointed time they all came in, and filed divers motions, demurrers, and other pleadings, and, on the same being overruled, each filed an answer, but all admitting that they had gone there before this committee, and had stated practically the things which it was alleged in the citation they had stated.

We have made a pretty thorough search in the law during the more than a month since the matters have been submitted to us. We feel that some statement is due from us to the bar and especially to the public regarding the status of the law.

United States courts, or courts having such jurisdiction, are unfortunately in a very feeble position regarding punishment for contempt. Most of the people do not know that as long ago as 1831, when United States Judge Peck was acquitted on impeachment before the United States Senate for having imprisoned an attorney for criticizing a decision of the court in a case that had already ended, a law was passed that has since become § 725 of the Revised Statutes of the United States (U. S. Comp. Stat. 1901, p. 583). By it the common-law power to punish as a contempt criticisms of United States courts or judges for cases that had already ended was taken away, and that law further set out that the "power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice," etc. These words, "or so near thereto, etc.," have since been many times construed to include cases of attorneys and others not in the actual presence of the court, and often have been held to include things done at considerable distances therefrom, when the same would "obstruct the administration of justice." There have also been many decisions holding that criticisms of the court

IV. Porto Rico—31.

regarding pending cases, with a view to influencing a jury or influencing or intimidating the court, are punishable either as acts of unprofessional conduct or as direct contempts. A good case in this regard is Ex parte McLeod, 120 Fed. 130 et seq. See also Patterson v. Colorado, 205 U. S. 462, 463, 51 L. ed. 881, 882, 27 Sup. Ct. Rep. 556, 10 A. & E. Ann. Cas. 689.

There has just come to hand a most exhaustive essay on the subjects we are here considering, that is, unprofessional conduct of attorneys and contempt of court, as to cases pending and cases already ended. The essay is to be found in notes to Re Breen, and Re Hart. The first is from the supreme court of the state of Nevada, and the second from the supreme court of the state of Minnesota. Both are reported in 17 L.R.A. (N.S.) 572 and 585, respectively. A perusal of these two cases and the notes that follow them will probably give any person desiring to be informed on these important subjects nearly all the law that it is possible to gather regarding the same in the United States at this date.

From what we have said already, it will be seen that, unfortunately, the Federal court on this island is not nearly as well empowered to take care of itself, or punish or prevent unjust criticism or clamor regarding it, as are the local insular courts, or as are the state courts in the several states of the Union. In other words, the hands of the Federal court in that regard are, to a considerable extent, tied by law. This law was passed nearly eighty years ago in the Unied States, at a time when the people were deeply prejudiced against the old sedition laws and against the exercise of common-law powers of punishment for contempt by courts. It will be seen from

Ex parte Mott.

a perusal of the notes in the Breen and Hart Cases, last above referred to, by the references therein made to several cases decided by the Supreme Court of the United States, that there are many things which the public at large probably believe are punishable as contempts which are not in fact so under the law. In many instances judges of courts, like others, are left to their remedy by personal action for criminal or civil libel or slander like other citizens, where a jury trial can be had by the defendant. However, we find it to be the law that attorneys owe to the courts proper respect, and that they owe this because of being officers of the court, in a higher degree, probably, than citizens at large. It is the duty, as set forth in the oath of office which they take, of all lawyers to maintain towards the court a respectful attitude, because the judges are not wholly free to defend themselves, and are peculiarly entitled to receive the support of the bar against unjust criticism and clamor. Conditions at the present time on this island give peculiar significance to this oath of office of attorneys at law here.

Referring again to the action of the local house of delegates, we find that while this committee was out taking evidence on this resolution first introduced, the house appeared to abandon it, and instead, substituted therefor a memorial to Congress, providing for the abolition of the Federal court on this island, or the restriction of its jurisdiction. Shortly thereafter it seemed to dawn upon the parties in the house of delegates who were at the bottom of this attack upon the Federal court, that it was hardly polite, to say the least, for them to make the attack, and hence they appeared to have abandoned this memorial also. A few days later, though whether spurred on to such action by the fact that this court had, in the meantime,

*Ex parte Mott.*

cited some of its own attorneys, who had appeared before this committee of the house, is not certain, a new and different resolution was suddenly made up one night and rushed through, censuring the present incumbent of this bench, and requesting the President of the United States to remove him from office. The resolution itself is based entirely upon the statements or "evidence" presented before the committee by these respondents and others. We can well understand the astonishment of the members of the bar of this court at seeing two or three of their own members dignify this outrageous act of this house of delegates by their presence before its committee. This house of delegates is not even a full-fledged house of representatives, as is the case in the several states and territories of the Union, because Congress, by the very terms of the organic act, made the executive council (the senate) a sort of guardian over it, and gave to the council alone many important legislative powers that, in the states, are shared by both houses jointly. The resolution attacking this court introduced before it is not a joint resolution, because the members of the house who entered into the conspiracy to introduce it no doubt well knew that such a resolution, if sent to the executive council or senate, would be tabled as promptly as a motion in that regard could send it there. Hence, the resolution, save for the prestige of the title of the house, has no more effect in law than if any other body of citizens anywhere else on the island signed the same as individuals. It can be said to the credit of the speaker and ten or more of the members of the house that they fought the resolution pretty hard, and voted against its passage. However, as soon as it was passed, as these respondents well knew it would be, it was sent out over the nation through the Associated Press,

Ex parte Mott.

and for several weeks the present incumbent of this bench has had his character blackened over the entire nation by these despatches. This publicity was largely aided by the publishing of our picture in many newspapers, because the photographers at Washington had the same, since the time we had the honor of being a member of Congress, and therefore tens of thousands of people know now that the house of delegates of Porto Rico has passed a resolution demanding that the President of the United States remove us from this bench. But the public will never to the same extent know that the resolution is based entirely upon the spite of three or four disgruntled lawyers and their clients in and out of the house of delegates; neither will the whole public ever know that many of the members of the house who voted for this foolish resolution did so in furtherance of the general plan of the house to get rid of the court as an institution, and force the attention of Congress to Porto Rico, in any manner that the same could be brought about. It may be that the fact that this same house has now brought about a crisis in the island by adjourning without passing any laws appropriating money to sustain the government will give the people some idea of their revolutionary tendencies. Committees are now *en route* to Washington to invoke the aid of Congress against the action of this house.

We well said at the outset that our position was a delicate one, first, because of the frivolous though outrageous character of the statements made by several of these respondents and others, all of which we assert are without foundation in fact and are malicious in the extreme, and next, because of this cruel and unauthorized act of a bare majority of this house of delegates. This body is not a court of impeachment or of ap-

Ex parte Mott.

peal, and has in no sense any authority or jurisdiction over this court; in fact, not even as much supposed authority as one house alone of a state legislature would have over a Federal court in the states, which, of course, is none at all. Its inter-meddling in the affairs of this court is an inexcusable imperti-nence. ·

The very thought that men of the standing of Mott, Hord, and Dexter, educated according to American legal ethics, as they were, so far countenanced this impertinent act of the house as to appear before their committee at all, is abhorrent. These very men, as it is said, took a large part in inducing Congress to place this court upon the island, as a sample of American tribunals, yet they go before this unauthorized committee in this way. This surely does not comport with the respect due to the court as an institution, much less that due to the court as a judge and as a man. No wonder that the entire population of the island was astonished at such conduct, and that the people looked to us for severe punishment, which they are not aware the law gives us no power to impose. We have little power to punish slanders of ourselves summarily. If lawyers from the States do such things, how can the court expect the people of the island to have respect for it? These men ought to have been the first to condemn and prevent such a farce from taking place at all. If they had any fault to find with the present incumbent of this bench it was cowardly to attack him in a place where he could not go to defend himself. They should have addressed themselves to the judge personally, or to the President of the United States, who appointed him. No possible exigency of the interests of their clients, corporate or individual, could have arisen, that would justify such an out-

Ex parte Mott.

rage. It requires no mental effort to feel assured that, without the approval of at least some of these lawyers, secretely given, the house of delegates or its members would probably never have proceeded with any such farce.

Since the holding of the Supreme Court of the United States in White v. Nicholls, 3 How. 291, 11 L. ed. 602, it is even possible that members of this house of delegates who thus insulted this court and its judge may be subject to citation for contempt, as they probably are subject to actions at the hands of the judge for the gross libels they have put upon him as a lawyer and a man. There cannot be much doubt but what those of the membership of the house who voted for this resolution who are members of the bar of this court are quite as guilty of unprofessional conduct as can be any of these respondents, and it is doubtful if their legislative privilege protects them as to that. Those who are inclined to question this proposition are asked to examine the case referred to.

When it is considered that the American government on this island has to deal with a body of men such as happen to compose a bare majority of the members of this present house, and who can be induced to do what they have done, then the public can, with much greater force, appreciate how the judge is entitled to the aid, support, respect, and confidence of the members of the bar practising before it. It is not certain whether it was some of these respondents who first suggested the introduction of this sort of a resolution in the house of delegates, or whether it sprang up spontaneously in the house as part of the general plan of anti-Americanism which has been the policy during the whole recent session, and that has now ended in the present crisis. It is not often that a court is, in this way, obliged, in

Ex parte Mott.

its own defense, to animadvert upon the actions of a co-ordinate branch of the government, and, although forced to it, we do it with sincere regret. Were the house attacked in pleadings in this court, the matter would be stricken from the files on the court's attention being called to the same. It is strange that an equal courtesy is not accorded us in that body. It must be remembered, though, as before stated, that this house of delegates is hardly a co-ordinate branch of the government. If these respondents did not themselves instigate the matter, it certainly was their duty, when they heard of the intention to introduce such a set of resolutions, to come and inform the court or the Bar Association, and prevent it if possible; yet, instead of doing this, they went before the committee, and while paying the court back-handed compliments as a man, shamelessly defamed him as a judge and a lawyer. Some of them unprofessionally retried several of their cases before this unauthorized and non-judicial committee of the house. Several of those cases were then, and still are, pending before the court here. It would serve no good purpose to set out here the statements which Messrs. Mott, Hord, and Dexter made before this committee. The record contains them. Mr. Mott in particular is to blame for the mass of malicious nonsense he put before the committee, and respondent Hord actually charged the court with falsifying a record in a pending case, simply because the court chose to stand by its own recollection rather than his, as to a minor occurrence during a trial. For the libels of these lawyers and others we, of course, have another remedy, which we can take at another time. The worst feature about respondent Dexter's statement before the committee is the fact that he went there at all, for he did not charge the court with any delinquency,

Ex, parte Mott.

save that of not deciding his cases with proper despatch, etc., and, like the presence of the others there, his only object could be to try to intimidate the court regarding the pending cases he referred to. Respondent Sarmiento never had but one case before this court, and while he is guilty of commenting upon and criticizing our rulings in it, while it is still before us, still, he is a rather decent sort of a man, who had no malice in his act, and had a mighty bad exemple set to him by these other respondents who knew better. No lawyer can look upon the action of respondents Mott, Hord, and Dexter, and not say that it was their bounden duty to refuse to attend before that committee, even if they were subpœnaed, as respondent Hord says he was. Or, if they did attend, it was their duty to have stood mute, or else to have denied the jurisdiction of the committee, and defended the court. In this attitude the court itself would have protected them, and, as they well know, would have released them upon habeas corpus did that committee or the house of delegates attempt to imprison them. They are all citizens of the United States, and this court has complete jurisdiction in the premises. Instead, in their several responses they practically acknowledge that they went willingly before this committee and made the statements, and insist that their statements are true, and that they had a right to make them, and have the effrontery to ask the court to consider them as purged upon such responses.

We doubt if any court had ever to deal with such a situation, and the least we say about it in this memorandum of our views the more likely we will be not to put matters and expressions of record that would not be palatable reading for respondents in future years.

### Ex parte Mott.

As was well said by the Supreme Court of the United States in United States v. Shipp, 203 U. S. 563, 51 L. ed. 319, 27 Sup. Ct. Rep. 165, 8 A. & E. Ann. Cas. 265, in contempt proceedings the court is not a party; there is nothing that affects the judge in his own person, and his only concern is that the law should be obeyed and enforced.

Respondents themselves brought about this whole unfortunate and unnecessary affair. By the action they have taken they have shut every door of escape for the court; but, to inflict on them the punishment they really deserve, if we had the power, would, in a measure, paralyze the business of the court. Therefore, we have to either impose on them in the meager way in which the inadequate law permits us to do it, the punishment that can be imposed, or else confess ourselves guilty of a species of judicial cowardice in protecting the dignity of the court, and this we are not willing to do.

We must leave to a discriminating bar and a just public opinion to pass judgment as to whether there was any real cause or just basis for the statements made by the respondents and others before this committee. It would not become us to dilate upon that. However, we might state that a small portion of our work during the two and a half years of our incumbency of this bench can be seen in volumes 2, 3, and 4, of Porto Rico Federal Reports. These volumes, which are filled with our written opinions, exhibit whatever more or less degree of care we took with our work, as well as the weighty class of litigation dealt with and the difficult questions involved.

While we reserve all our personal rights against all persons in and out of the house of delegates, whether members of this bar or not, and may yet assert them in our own individual

vindication, as we may be advised is best, still we regret this whole unfortunate affair. The usual saying that the lawyer who attacks the court commits professional suicide has no meaning for us. These respondents will receive the same treatment after this matter is over as they received before. So far as the court is concerned, in matters before it, they will get simply "a square deal,"—no more and no less.

Our findings and final action will be found in a short paper filed in each of the cases respectively.

Note.—The court imposed a suspension from practice of six months and a fine of $150 on respondent Mott; a suspension from practice of thirty days and a fine of $100 on respondent Hord; a suspension of thirty days without any fine on respondent Dexter; and discharged respondent Sarmiento.

A reading of the foregoing statement and opinion probably does not convey sufficient information to the reader regarding this very unique matter. Therefore the following additional information is given. Two members in particular from among the members of the house of delegates appeared to be the chief movers in the proceedings in the house, and in the advertising for and the taking of "testimony." They were Herminio Diaz Navarro and Cayetano Coll y Cuchi, both members of the bar of this court. It cannot be ascertained what caused them to act, save that it is believed they were friends of several of the parties—attorneys, editors, and politicians—who claimed they had cause for personal spite against the court. The only case in which it is known that Diaz and Coll y Cuchi were dissatisfied was one entitled, United States v. Société Anonyme des Sucreries de Saint Jean, where the court imposed the minimum fine of a thousand dollars on their client, under the United States statute, after a jury had found the defendant guilty of importing contract labor to the island. The cause is still pending on appeal in the Supreme Court of the United States.

The other parties who appeared before this legislative committee and testified were Vicente Balbas, editor of the Heraldo Español. His enmity was founded on his pretended dissatisfaction with the court's ruling and the jury's verdict in and about a libel suit against his newspaper, entitled, Calderin v. Heraldo Español, ante, 376; Juan Vias Ochoteco, head of the insular consolidated department (sanitary board of the island). His

## Ex parte Mott.

feeling against the court, it appears, was caused because of the punishing for contempt of his subordinate, Dr. Martinez, in the case of Commercial Invest. Co. v. Mayaguez L. & P. Co. ante, 267, because said subordinate had interfered with a receiver of the court, and had attempted to put the receiver in jail twice. Ochoteco appeared also to have been dissatisfied with the court's ruling in the matter of the distribution of a fund that was in the registry of the court in the matter of Rodriguez y Pujals v. Argueso y Flores, ante, 216.

Mr. Laureano Sarria also testified before the committee. His dissatisfaction was based on the court's decision in LeBrun v. Romero, 3 Porto Rico Fed. Rep. 225, and on its decision in LeBrun v. Sixto, 3 Porto Rico Fed. Rep. 492, which former decision was made necessary by the decision of the Supreme Court of the United States in Sixto v. Sarria, 196 U. S. 175, 49 L. ed. 436, 25 Sup. Ct. Rep. 186.

Respondent Mott's dissatisfaction was based principally upon the fact that, owing to his annoying manner in the conduct of trials, the court had spoken crossly to him five or six times within the previous two and a half years. He also claimed to be dissatisfied with the rulings in Rivera v. Sun Life Assur. Co. 3 Porto Rico Fed. Rep. 351, and 3 Porto Rico Fed. Rep. 455; and with the ruling in Gonzalez v. Buist, ante 243; and with the ruling in the three trials of Herrera v. Valdes, ante, 409, although the new trial, as requested, had been granted when he testified.

Respondent Hord did not express his dissatisfaction with the court's action in more than one or two cases, the principal one being Pettingill v. Gandia, ante, 383.

Respondent Dexter's complaint appeared to be that the court did not decide several cases in which he was interested with sufficient promptness to suit him, particularly one of his personal cases, entitled Dexter v. Arzuaga, ante, 344, and the cases entitled Blanco v. Fernandez y Perez, ante, 428, and Marini v. De la Baume, ante, 472.

The case with the rulings in which respondent Sarmiento claimed to be dissatisfied was the Dexter v. Arzuaga Case, supra.