STATE BOARD OF LAW EXAMINERS v. FRANCIS B. HART.[1]

April 24, 1908.

No. 15,562.

**Criticism of Court's Rulings.**

> Every citizen has the right to comment upon and criticise without any restriction the rulings of a judicial officer in an action which has been finally determined, and not be answerable therefor otherwise than in an action triable by a jury.

**Criticism by an Attorney.**

> An attorney has such right, and can be disbarred for such comment or criticism, if at all, only when it is so base and vile as to establish clearly his bad character and his unfitness to remain a member of an honorable profession.

**Disbarment of Attorney.**

> An attorney may not, however, insult the judicial officer by words written or spoken addressed to such officer personally because of the latter's

[1] Reported in 116 N. W. 212.

official act, though in a matter fully ended; and, if he does so, it may constitute a sufficient cause for his disbarment.

**Suspension of Attorney.**

> The accused herein having written a personal letter to the chief justice of this court, impugning both the intelligence and the integrity of said chief justice and his associates in the decisions of certain appeals in which he had been attorney for the defeated litigants, it is *held* that he was thereby guilty of professional misconduct, for which he is suspended from practice for the period of six months.

Verified accusation of the secretary of the state board of law examiners charging Francis B. Hart, who for more than thirty years had been an attorney at law of the state of Minnesota, with the wilful violation of his official oath as such attorney at law and of the duties imposed upon him by the state statutes to (1) observe and carry out the terms of his oath, and (2) maintain the respect due to courts of justice and judicial officers.

It was charged that such violation was committed by composing and publishing a letter over his own name addressed to the chief justice of this court by name and official title, which was couched in insulting and contemptuous language, and purposely so worded as to cause those persons who might read the letter, and believe the statements and insinuations contained therein, to doubt the honesty and integrity of this court, the justices composing the same, and of certain judges of the district courts of the state. That among many charges and insinuations the letter contained the following language:

> On Jan. 1, 1900, Mitchell, the last of the old guard, retired by expiration of his term, and three new members constituting a majority of the court, were installed. This date and event marks the finis of the old régime and the dawn of a new judicial epoch in Minnesota. The sharp contrast between the lofty ideals which actuated the old court, and the predominating tendencies of the reorganized court can be gathered from the case of Minneapolis Trust Co. v. Menage, reported (1) in 73 Minn. 441; (2) 81 Minn. 186; (3) 86 Minn. 1.

That the accused inserted in said letter a long, garbled and one-sided statement purporting to be a fair history of that case, interspersed

with comments laudatory of the first decision of the supreme court in the case, which decision was favorable to the side which had employed the accused as attorney, and derogatory and condemnatory of the two later decisions therein, which were adverse to the interests represented by him, and ended his pretended account of the case with these words:

> We do not here and now charge, insinuate, or suggest, that the decisions were prompted by interest, or promise, or hope, or fear. We do submit that on the record, and by the record, the conclusions arrived at and acquiesced in are illogical, illegal, unsupported, and indefensible from any rational standpoint; that from want of understanding, or the abuse of it, the cause has not been judicially considered or determined.

That under "second specification," the accused inserted what purported to be a fair and correct statement of the facts and law involved in the case of Griswold v. McGee, 102 Minn. 114, and in commenting on said decision stated that "You" (referring to the chief justice, to whom the letter was addressed, and the other justices constituting this court) "assigned it," (meaning the property involved) "to one who has no better right to it than the burglar to his plunder. It seems like robbing a widow to reward a fraud, with the court acting as a fence or umpire, watchful and vigilant that the widow get no undue advantage."

That in his discussion of the last decision in the case of Minneapolis Trust Co. v. Menage, the accused insinuates and in effect charges that the decision made by the district judge who tried the case, whose decision was affirmed by this court, knowingly decided the case contrary to the evidence given on the trial. That in his "second specification" he accused the district judge whose decision was affirmed by this court with having decided the case of Griswold v. McGee "without giving the question" presented for settlement "any consideration whatever."

That this letter, though formally addressed to the chief justice of the supreme court, was really intended for publication in newspapers and otherwise, and to create in the minds of the general public distrust in this court and other courts of Minnesota and to lead the general public to believe these courts were corrupt. That to cause

the general public to believe the justices of the supreme court could be impeached under the state laws for corrupt acts and that impeachment proceedings were about to be begun, the letter began with this language:

> Sir: The organic law creating the tribunal over which you now preside renders its constituent membership immune from civil liability for any erroneous decision officially made, even though it be corrupt. The sole remedy is by impeachment. Preliminary to moving articles, I submit three specifications:

That to cause the general public to believe that grounds for the impeachment of said justices existed and were truthfully stated in this letter, the accused composed and published another letter, addressed to the governor of the state, by name and title, as follows:

December 7, 1907.

Gov. John A. Johnson,
    Executive Office, Capitol Building,
        St. Paul, Minn.
Dear Sir:

Enclosed I hand you copy of a letter this day mailed to Hon. Charles M. Start, chief justice of the supreme court of the state. It explains itself. My object in preparing the paper is to present in an orderly manner the character of alleged grievances existing against the court, and to advise the court thereof, that proper inquiry may be made (1) as to whether they are in fact grievances. That is, are the decisions referred to, or any of them, right? (2) If not right, is it possible in the making of them for the court to have been honestly wrong? (3) If not, is such flagrant disregard and violation of the rights of litigants, without warrant of law or any apparent honest purpose or excuse a just cause of impeachment?

It is a serious matter, and, therefore, an important one. I leave it to your good judgment as to what shall, at this time, be done in the premise. Political complications may suggest themselves, but it is not a question of politics. It goes

to the integrity and stability of the state if the members of the court cannot be "men learned in the law," as required by the constitution, or honest, as required by good morals, and if there exist good prima facie reasons for challenging them in either regard, the matter should receive prompt attention. Presumptions undoubtedly exist in their favor, but if the cases cited render such presumptions violent and absurd, they should not stand in the way.

The attorney general's office, or the judiciary committee of the house, or both, are your properly constituted legal advisers in this matter. You surely will not act hastily, and as the merits of the charges rest entirely upon what the court itself has said and done, it is not easy for you to act unjustly. If no proper motive for the decisions can be gathered from the decisions themselves, it seems to me that impeachment would be proper, leaving the senate free to make inquiry as to motive outside of the decisions, and I am constrained to think that not a little evidence can be adduced relevant thereto.

Very sincerely yours,

(Signed) Francis B. Hart.

That as the accused well knew at the time he composed and published these letters, no grounds for questioning the honesty and integrity of this court, or of any justice thereof, or for the impeachment of any justice thereof, existed in either of the acts or decisions of the court specified by him. That as he well knew, these letters stated no facts which would justify the taking of any official action thereon by the governor. That these letters were not composed or published with the intent or expectation that official action for the impeachment of said justices would be taken, but were written and published for the purpose and object of creating distrust in all said courts, justices and judges who had decided causes submitted to them adversely to the interests represented by and contentions of the accused. That about December 7, 1907, these letters were furnished by the accused to certain newspapers in the state for publication and general distribution, and after being so furnished the letter addressed to the governor was sent by mail to his office and a car-

bon copy or duplicate of the letter addressed to the chief justice was sent in the same manner to his office. That the copy so sent to the chief justice was not sent to him for any official or other action thereon, but was so sent for the purpose of insulting the chief justice and the other justices of this court. The accusation prayed for the removal of the accused from his office as attorney at law of the state.

An order having been made that the accused appear before the court and answer the accusation, the chief justice addressed a letter to the governor stating that the justices "deem themselves disqualified within the meaning of section 3, article 6, of the state constitution, to hear and determine" the matter, and requested him to assign five judges of the district court to sit in their place. Thereupon the governor appointed the five judges named in the footnote on page 108 to constitute a special supreme court to hear and determine this proceeding.

On the return day of the order the accused filed objections to the accusation on the grounds that the facts stated did not warrant the relief asked, and it affirmatively appeared from the accusation that the accused observed the obligations of his official oath as an attorney and rendered full obedience to all requirements imposed on him by the statutes of the state. These objections having been overruled the accused entered an oral plea of "not guilty." A referee was appointed to take and report the testimony, and after he had made his report, the matter was argued before the special court.

*Edward Lees, P. J. McLaughlin,* and *E. Southworth,* for petitioner.

If, as charged, the object and intent of the accused in preparing and publishing the letters, was to create in the minds of the public the belief that the justices of the supreme court are corrupt, we can conceive of no act which an attorney at law could commit by which he would more directly and emphatically violate his oath to conduct himself "with all good fidelity" to the court, or be a more direct and emphatic breach of the obligation imposed upon him by our statutes, to "maintain the respect due to courts of justice and judicial officers." Nor can we conceive of any act of which an attorney at law can be guilty, more dangerous to the peace and good order of the community than a wilful attempt to cause the people to be-

lieve that the only officers to whom a final appeal can be made for the maintenance of rights and the redress of wrongs are corrupt and unreliable. Fidelity, as defined in the Century Dictionary, means: 1. Good faith; careful and exact observance of duty or performance of obligations; as conjugal or official fidelity. 2. Faithful devotion or submission; unswerving adherence; close or exact conformity; fealty; allegiance; as, fidelity to a husband or wife, or to a trust; fidelity to one's principles or to instructions; the dog is the type of fidelity. 3. Faithful adherence to truth or reality; strict conformity to fact; truthfulness; exactness; accuracy; as, the fidelity of a witness, of a narrative, or of a picture. Respect, as defined by the same authority, has many meanings, those applicable here being: 2. * * * Consideration. 3. Circumspect behavior or deportment; decency. 4. The feeling of esteem, regard or consideration excited by contemplation of personal worth, dignity or power. 5. Courteous or considerate treatment; that which is due, as to personal worth or power. 6. Expression or sign of esteem, deference, or compliment; as to pay one's respects to the governor; please give him my respects. The "fidelity" and "respect" of the accused is shown by the quoted parts of his letters.

As we understand the accused's position, his defense herein is based upon three propositions or claims made by him:

First. That the letters were written by him in his capacity as a citizen, and not as an attorney at law, and hence he was not laboring under the restraints imposed by the oath and statute upon an attorney at law, and that the attorney as such cannot be punished for the act of a citizen.

Second. That the letters were honestly and without malice prepared, delivered and published for the purpose of calling the attention of the proper authorities to the corrupt character of the justices of this court, with the view of securing their removal from office.

Third. That the letters contained only fair and honest criticism of the judicial acts therein referred to, and information to the general public of the corrupt character of the judges, justices and courts condemned, of which the public should be informed.

The first proposition was evidently an afterthought, as, on the return of the order commanding him to answer, he objected to the sufficiency of the accusation and elaborated his objections with a long and carefully prepared written and oral argument, but made no reference to this point, which was raised for the first time at the hearing before the referee, in the form of objections to the introduction of any evidence upon this ground. This point is probably based upon the decision in Ex parte Steinman, 95 Pa. St. 220, and obiter remarks in a few other cases.

In that case Steinman and his partner were both attorneys at law and editors of a newspaper and they printed in their paper an article very severely reflecting upon the conduct of the court in a certain prosecution in the Quarter Sessions, in which the defendant had been acquitted on an indictment for violating the liquor law. It charged that the acquittal "was secured by a prostitution of the machinery of justice to serve the exigencies of the Republican party," and added that as the judges belonged to that party it was unanimous—for once —that it need take no cognizance of the imposition practiced upon it, and the disgrace attaching to it. For this publication the editors were disbarred by the court which they had condemned, and on appeal the supreme court reversed this judgment under their constitutional provision that "no conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury," and on the ground that the publication was made by them as editors and not as attorneys. That case is distinguished from the case at bar, in at least three important particulars: 1. We have no such constitutional provision. 2. The persons disbarred were editors publishing the offensive article as an editorial in their own paper. 3. They were not condemning or threatening the judges for decisions rendered in cases which, as attorneys, the publishers had litigated in the court. See State v. McClaugherty, 33 W. Va. 250.

We have not been able to find any case in which it has been held that it was not a violation of the oath and duties imposed by law upon

an attorney, for him to publish a libel of or threaten or assault a judge because of a decision rendered by such judge in an action in which such attorney has represented the losing side, or in which it has been held that such act should be considered and treated merely as an act of a citizen, and could be punished by the court only in the manner in which any citizen, not an attorney, could be punished.

Among the cases in which disbarment has been upheld for libelling a court or judge for past acts or decisions, see In re Brown, 3 Wyo. 121; State v. McClaugherty, supra; People v. Green, 7 Colo. 237.

But conclusive upon the question of whether these letters were written and published as a citizen or as an attorney at law, is the very nature and substance of the entire letters. Respondent claims in these letters that the judges and justices who participated in the decisions mentioned by him, are corrupt and should be impeached and removed from office. And why? In his second letter to Governor Johnson respondent says: "No one would for a moment think or suspect that any member of the court would sell his opinion for a cash consideration. In that sense, there is no charge or thought of corruption." And there is no charge or hint anywhere, in any of the letters, of any other outside influence having been exerted upon them, unless it be the insinuation in the closing paragraph of the first letter to the governor. On the contrary, in these letters and by the evidence offered by him, he rests his charge of corruption solely on the ground that the decisions complained of are so clearly wrong, as appears by the decisions themselves, that it is corrupt and misconduct for men so ignorant and incompetent to hold a judicial office.

Could any intelligent citizen, who was not a lawyer, carry a load of conceit sufficient to prompt him to sit in review of the supreme court of the state, and declare its decisions not merely erroneous, but so absolutely and clearly wrong as to show incompetence in all the justices? It required a lawyer to do this, and not a mere ordinary lawyer at that. It required a lawyer who believed that he was so infinitely superior, as a lawyer, to each and all of the supreme court justices, that he could review, and infallibly pass upon the correctness of their decisions and upon their qualifications to fill the office, beyond a possibility of doubt as to the correctness of his conclusions. And not only must this lawyer believe himself to be so infal-

lible as a lawyer, but he must believe himself possessed of such a dispassionate and impartial mind that he could disregard all prejudice and preconceptions derived from his long study and advocacy of one side of the case, and calmly and infallibly review the decision of disinterested judges, which had been arrived at after the examination of both sides.

Not one of the judges condemned by the respondent could be induced to decide or review a decision in a case in which such judge had been employed as counsel, but respondent is, in his opinion, so superior, that the bare possibility that his judgment may be prejudiced by his relations to the cases reviewed by him, does not appear to have had place in his mind.

Notwithstanding that in these letters he speaks only as a lawyer and an infallible one, he asks this court to believe that he was speaking only as a citizen, and because of that fact, to permit him to escape the penalty which a lawyer, acting as he has done, would have incurred!

He knew, when he wrote and published these letters, that the only weight the charges made or hinted at by him, would or could have, was derived from the fact that he was an attorney at law, an officer of the court. In his letter to the publisher of the "Dispatch," Exhibit 1, in which he requests him to "accompany the publication with an editorial that will put the judiciary squarely upon its mettle regarding the merits of the controversy," he said: "If the decisions are, as claimed, unjudicial from any standpoint, or for any cause, and the criticism upon them *lawyer-like* and just, the unfitness of the court becomes manifest." ."If the charges set forth in the letter are well founded and just, the propriety of resignation upon the part of members of the court becomes too apparent to need suggestion. If the decisions are right, Mr. Hart should cease to practice law."

Is it an answer to the accusation that the cases, which respondent says were erroneously decided, were no longer pending, when he published the letters in question? It appears to be his theory that since the strictures upon the court relate to its actions in the past, he has merely exercised the privilege of free speech which the constitution guaranties to every citizen. It must be conceded that every man, whether lawyer or layman, has the right to freely criticise the

104 M.—7

acts of public officers, including judicial officers. If in so doing he abuses the privilege he is answerable for such abuse. If he abuses the privilege in speaking or writing of courts or judges, he is answerable for contempt as well as for libel. While there is a diversity of authority as to whether he is answerable for contempt when his written or spoken words relate to judicial conduct in a case no longer pending, the weight of reason and authority makes no distinction between pending cases and cases finally adjudicated.

To impute corruption and a perversion of justice to a judge is attended by more mischievous consequences than a blow, and yet to strike a judge for having rendered an adverse decision has always been held to be a contempt. Rex v. Almon, Wilmot Op. p. 253; Reg. v. Gray [1900] 2 Q. B. 36; In re Wallace, L. R. 1 P. C. 283; Com. v. Dandridge, 2 Va. Cas. 408; Burdett v. Com., 103 Va. 838; State v. Morrill, 16 Ark. 384; State v. Shepherd, 177 Mo. 205; U. S. v. Gehr, 116 Fed. 520; In re Chadwick, 109 Mich. 588.

If respondent as a citizen falsely charged the justices of the supreme court with corruption and dishonesty, even though the charge referred to decisions they had rendered in cases no longer pending before them, he was punishable as a citizen for contempt of court. But as a lawyer, and officer of the court, he is also subject to disbarment, because he has failed to observe towards the court and justices the respect which is due from him. As an individual he is punishable for his contemptuous and insulting language concerning judicial officers. If as an individual he has been guilty of conduct of that nature, it inevitably follows that as a lawyer he has failed to observe due respect towards the court. He occupies a dual position. Citizen Hart has been guilty of contempt of court. Attorney Hart is also guilty of contempt of court, and because he is guilty he has not observed due respect towards the court.

What graver offence can an attorney commit? How can he more completely violate his oath? To falsely charge the justices with conduct which requires their impeachment is a greater indignity to them than to strike each of them a blow. Such a charge coming from an officer of the court has greater weight than if it came from a layman. It necessarily impairs public confidence in the administration of justice. Future decisions of the court will fail to command the

confidence of the public, shaken by the false charges and insinuations of respondent and given wide-spread publicity by the press. Is this not impairing the administration of justice? What more can any lawyer do to instil into the minds of the citizens of Minnesota suspicion and distrust of the courts? If it be true that to falsely accuse a judge of corruption in office is to commit a contempt of court, by impairing public confidence in the court, can it be said with any show of reason that a lawyer who has put forth and circulated such an accusation has not violated every rule of fidelity and honor which he is bound to obey at the hazard of his license to practice his profession?

Were the letters honestly and without malice prepared, delivered and published for the purpose of calling the attention of the proper authorities to the corrupt character of the justices of this court, with the view of securing their removal from office?

This position is most emphatically negatived by every act of the respondent relative to the preparation and publication of the letters, and by the entire substance and language of the letters themselves. Under our constitution (art. 13, § 1), judges of the supreme court and district courts can be removed only by impeachment, and that can be only "for corrupt conduct in office, or for crimes and misdemeanors," and article 4, section 14, provides that "the house of representatives shall have the sole power of impeachment." These facts are not only presumably known to the respondent, as an attorney of many years standing, but he expressly asserts his knowledge of them in the first paragraph of the letter addressed to Chief Justice Start. That the letters were not prepared or published for the purpose of securing official action for the removal of the justices, is clearly shown: 1. By the fact that there was no official body in session, which could take such action. 2. The letters were not addressed to the only body which could impeach. 3. The letters are not in the form of charges of acts explicitly alleged to be corrupt, so that issue thereto could be raised and tried, but refer to certain decisions, and by argument, question, innuendo and insulting and contemptuous comments, and condemnation, seek to convey the impression to the readers that the judges who made such decisions must be dishonest and corrupt. 4. The

letters were prepared for publication in newspapers and were furnished to editors of papers for publication long before they were mailed to the parties to whom they were nominally addressed, and the whole tone of the letters show that they were really intended for the public perusal, and not as a commencement of legal proceedings. 5. The letters, as modified and explained by the second letter nominally addressed to Governor Johnson, Exhibit C, do not contain, even by question, innuendo or condemnatory comments, charges for which the justices could be impeached, and no evidence of wrong influence or motive influencing any of the judges or justices condemned by respondent was offered. On the contrary, all that the accused claims to be able to show, is incompetency and ignorance of the law.

There have been many cases of impeachment of judges in this country, involving charges of misconduct and corruption, and in most of them the question of what constitutes an impeachable offense has been discussed, and in no case has it been held that impeachment would lie because of a wrong decision resulting from incompetency or ignorance of law, uninfluenced by ulterior corrupt motives. Trial of Francis Hopkins, Penn. State Trials, 1780; 3 Trial of George G. Barnard, 2037. Our state library contains the published proceedings in the following trials, all of which have been carefully examined: Barnard, (G. G.) Justice of N. Y., 1872; Chase, (Samuel) Justice U. S. Sup. Ct., 1804; Cox, (E. St. J.) Judge Ninth Judicial Dist. 1881; Curtis, (G. M.) Justice Marine Court, 1872; Hubbell, (Levi) Judge Second Jud. Court, 1853; McCunn, (J. H.) Justice Superior Ct., N. Y., 1872; Page, (S.) Judge Tenth Judicial Dist., 1878; Prindle, (H. G.) County Judge, 1872; Smith, (G. W.) Judge Oneida County, 1866; Botkin, (Theodosius) Dist. Judge, Kansas, 1891; Swayne, (Charles) U. S. Dist. Judge, Florida. In none of these cases has a judge been called upon to defend because of a wrong decision, charged to have resulted solely from incompetence or ignorance of the law, nor in any has incompetency or ignorance, uninfluenced by ulterior motives, been charged as corruption. On the contrary in several cases, where the acts and decisions complained of were directly contrary to express statutory provisions, many members of the senates have explained their votes of not guilty on the ground that they believe the act to have been ignorantly done and not corruptly.

In this case respondent has had his day in court and every opportunity to introduce evidence, if any were obtainable, to show any dishonest or corrupt act of any justice or judge included in his condemnation, and he has not offered one word, even hinting in that direction, or in support of his vile, ungentlemanly, unprofessional, contemptuous, insulting and libellous charges, statements and insinuations.

It has been uniformly held by all courts from the earliest times that the obligation which attorneys assume when admitted to the bar is not discharged by merely observing the rules of courteous demeanor in open court, but includes abstaining out of court from insulting language and offensive conduct towards the judges personally for their judicial acts. 3 Am. & Eng. Enc. (2d Ed.) 302, 306.

An attorney as an officer of the court is under special obligation to be considerate and respectful in his conduct and communications to the court or judge, and for a wilful violation of his duty to respect courts he may be removed from office. Ex parte Secombe, 19 How. 9–16; In re Woolley, 74 Ky. 95; Harrison v. State, 35 Ark. 458; In re Griffin, 1 N. Y. Supp. 8; In re Wilkes, 3 N. Y. Supp. 753; Bradley v. Fisher, 13 Wall. 335, 337.

What public interest, then, did the respondent intend to subserve by writing and publishing the letter? He says: "Preliminary to moving articles" (of impeachment) "I submit three specifications." Why at this time, and in the manner adopted by him? There was no legislature in session, and none would be for two years. Why did not the respondent move impeachment at the 1903, or 1905, or 1907 session of the legislature? Is it at all reasonable to suppose that the respondent believed the governor would call a special session of the legislature for the purpose at this time? The respondent, with all the information he claims to possess, had waited for years. But this is assuming that he believed that grounds of impeachment in fact existed. But did he so believe? One assuming to criticise the decisions of the highest court in the state should be presumed to know that judges may be impeached only for corrupt conduct in office, or for crimes and misdemeanors.

Unless, therefore, he has charged the court or judges with such conduct or crime he knew there could be no impeachment, he certain-

ly knew there could be no impeachment for erroneous decisions; if it were conceded that the decisions were erroneous.

Again, even if he believes that grounds for impeachment existed, why rush into print? Did he desire to create such a prejudice and bias in the public mind as to make it difficult or impossible to obtain a fair trial? No good purpose could be subserved by the publication of his alleged articles. He could have quietly consulted with the governor and his legal advisers as to whether a special session of the legislature should be called, and, if that were deemed advisable, he could then have prepared his articles and submitted them at the proper time in a proper way. Nothing short of bad faith can be predicated of the respondent's acts and conduct. His statement that his so-called specifications were preliminary to moving articles of impeachment was the shallowest pretense and mere excuse for a premeditated attack upon the court in the columns of the newspapers without any justification whatever; the motive is transparent. If the respondent believed that in his "specifications" he stated grounds for impeachment he must have intended by his language to charge corruption in office, or crimes, and must have intended that those who read his letter should believe that the court was guilty, and we think the letter is susceptible of that meaning, and of none other.

*Francis B. Hart,* pro se.

We must not forget that we have a people's government. The people alone are supreme, both in authority and right. Those chosen for and qualifying to office become sworn servants of the people. The sole dignity which attaches or can attach to the incumbent personally must be by him earned and demonstrated in the faithful discharge of duty as such servant. Watchful control of its public servants and swift arraignment of every neglect, abuse or disorder in the service is the economy and insurance of healthful administration. Every branch of government service is equally amenable to this disinfecting research. The apparent respite of the court is only until its decision in any cause shall have been made and its jurisdiction thereof concluded. Then, and not till then, can the citizen exercise unrestrained freedom in regard to any action taken or judgment rendered without a violation of any of its rules or rights, and within his constitutional prerogative.

In State v. Circuit Court of Eau Claire County, 97 Wis. 1, it appeared that the relator, an attorney of the court, composed and published an article, charging the judge "with having been intentionally partial and corrupt in the trial of certain causes in his court." The opinion says: The right of free speech and of free publication of the citizen's sentiment "on all subjects" is guaranteed to all citizens. * * * In our judgment, no such divinity as this (freedom from criticism) "doth hedge about" a judge. See Ex parte Steinman, 95 Pa. St. 220; State v. Burnham, 9 N. H. 34; Case of Austin, 5 Rawle, 191.

There is a stronger corrective agency than criticism and exposure of a court's mistakes for the prompt arrest and arraignment of such misdoings when clearly wilful and intentional in their inception, or when purposely and tenaciously adhered to after the errors shall have been pointed out and their amendment and correction seasonably demanded. It is by the impeachment of the offending parties. It is this more drastic and adequate relief which the respondent seeks to have set in motion and actively applied. It is this which it is the solicitude and effort of the members of the court and those acting in their behalf, to ward off, through this reprisal procedure.

In the preparation of the Minnesota constitution, the removal of judges by address, substantially as provided by the Wisconsin constitution, was proposed and rejected. This was not to extend to the judiciary greater license or immunity, but because the remedy by impeachment was deemed correlative and adequate, as had already been decided in Wisconsin. It has proved so in actual practice in this state. The direct question was presented and decided in the charges of impeachment against Judge Page.

E. St. Julien Cox, judge of the Ninth judicial district, which then embraced a large area, requiring him to hold forty seven separate terms of court each year, which he did hold, and never adjourned a term with an unfinished calendar, was impeached for the mere indulgence of a habit which temporarily disqualified him for the exercise of his understanding in matters and things then before him as such judge. It was shown that upon eighteen different occasions this had occurred. For this he was removed from office. No indictable offence, surely. The gist of it was the temporary clouding of his understanding. This

caused litigants and the public to suffer and he was rightly convicted.

The state constitution (art. 13, § 1) provides that judges may be impeached "for corrupt conduct in office or for crimes and misdemeanors." If the corrupt conduct was intended only to embrace conduct constituting crimes indictable, why specify it at all? In the Page impeachment Governor Davis, for the accused, conceded that the plain meaning of this language was that a judge might be impeached for improper conduct, though not criminal. When a judge subverts his power to an improper use, when he indulges in partiality, regardless of cause, when arbitrary or tyrannical in his rulings or orders, although not amounting to criminal turpitude, he renders himself amenable to impeachment. Blunders and mistakes thoughtlessly and innocently made are not the subject of impeachment. But, while still having power to correct and rectify after attention shall have been rivetted upon them, if refused, mistakes no longer rank as mistakes, but as wilful offending, and impeachable. The judge must ever and at all times and upon all occasions, act justly in his office and gross error can never be or become just. It must be eradicated and abandoned. The object of impeachment, as stated by Judge Story, is not so much designed to punish an offender as to protect the state against gross misdemeanor.

In impeachment parlance, misdemeanor has obtained a meaning entirely distinct and different from police-court crime. Impeachment is not to punish but to try a man's fitness for office, and misdemeanor in this sense is merely unfitness. The office of judge belongs to the people. It is created for their use and its duties must be discharged in honor. To bring it in disrepute and disgrace, only by so much as one unjust decision, tenaciously and wilfully adhered to after being informed and instructed in regard to the error, ought to be and is a cause for impeachment. No man has an inalienable right to office, all have an inalienable right to justice and to be protected in the right by the judiciary. It is for this very purpose that the judicial office is created.

Wherein is the procedure adopted by the respondent for bringing about the impeachment of the judges for wilful misdeeds, at fault? It is in this: (1) To assume to know enough to know when the supreme court has erred in construing and applying the law is consum-

mate conceit. (2) To dare tell the public what the supreme court knows is cruelty.

The judges in our courts of last resort are the trustee-appointed arbiters of the law. Their decisions should be entitled to and command profound respect. But in order for this, the judge making the decision must, in the decision and by it, declare himself a judge. Failing in this, no disbarment of his critic will augment his judgeship. Speaking for the court, Judge Flandrau in the Curtis case, 3 Minn. 188 (274), declared: "While we will go as far as we can to support that proper respect which is due the administration of justice in the courts, our first duty, to entitle ourselves to receive that respect, is an adherence to well-settled rules of decision."

A hundred years ago almost this very hour, the empire state granted a perpetual franchise to Fulton and Livingston for navigating by steam power the waters of the North and East rivers. This grant is the incunabula of private monopoly in this country. The same year Stevens launched his double-screw propeller and they drove him to the waters of the Delaware. Fifteen years later in Gibbons v. Ogden, [9 Wheat. 1] Chief Justice Marshall held that the great highways of commerce and trade whether natural or artificial are not the proper subjects of private monopoly and he annulled the charter. Today this decision is respected, given extended application and enforced, not because Marshall made it, but because it is bottomed in fundamental justice to all parties affected. The life of it is its wisdom. Respect for and obedience to it is not automatic and perfunctory out of regard for the author, great though he was, but because justice commands. In the healthy and vigorous administration of justice, justice and justice alone must be the incentive.

It is difficult to analyze and answer the reasoning of our friends in their efforts to extricate the members of the court because of the wavering compass they follow. They say, he could have quietly consulted with the governor. He did. He indulged in the deafening silence of a letter which put even the ears of the governor out of commission. And what did the governor do? Precisely what any well-balanced governor, holding the reins of a separate, independent department of the government would have done. He was in no wise responsible for the miscarriages of the judiciary. It is a separate and distinct part of

the government, the administration of which is not the governor's concern, except in common with all citizens. Officially he has nothing to do with it. They say the legislature was not in session. For that reason the respondent addressed the principal direct, as also the governor, their executive officer. Was it not feasible to convene the legislature in session? Certainly, but not until the people demanded it. The governor has but slight discretion. He can convene the legislature to impeach co-officials who are subject thereto, when commanded and instructed by public opinion. No wise governor would do it before. They say that one assuming to criticise the decisions of the highest court in the state should be presumed to know that judges may be impeached only for corrupt conduct in office. That is precisely what the respondent did know. He charged corrupt conduct within Gove v. Blethen, 21 Minn. 80, and laid bare the evidence proving it. Do they controvert the evidence? Only by the insinuation that the supreme court knows and that because the respondent was the defeated attorney in the causes he don't know. Why do they studiously disregard the authorities of such long-standing and general acceptance as to furnish a common light to all—the only safe and sure guide? Or why do they not point out wherein the long-settled law is wrong in principle, or of injudicious application?

What is the corrupt conduct of the members of the supreme court, as charged by the respondent? Those speaking for them say it was naught but to honestly disagree with the respondent, regarding the proper determination of causes in which the respondent conducting the litigation, had a personal interest and a prejudiced judgment, whereas the court was better informed, unbiased and conclusively presumed to be right. If this is true, the respondent ought to be disbarred. But is it at all true? Nowhere can it be pointed out that the respondent pitted his legal acumen and judgment against that of the judges. Their offending was in violating the law, not in disagreeing with an advocate. The arrogance of the court consists in disregarding and over-riding well-established and settled laws of the state without reason and without cause; in discriminating where there is no distinction, totally indifferent whether they are right or wrong. Take the Ahern case. [101 Minn. 34]. The identical judge writing the opinion had a short time before stated the rule of practice to be well-settled that where

.the order (appealed from) is explicit in itself, the memorandum will not be considered unless made a part of the order. The order in the Ahern case was explicit. The memorandum was not a part of it. But the trial court was reversed solely and explicitly because of a careless remark in the memorandum, the truth of which was contradicted by every fact in the case clearly spread before the court. Is this a mere difference of opinion between the attorney and the court? Is it not a wilful disregard of the law of procedure as theretofore established by the court itself in a long line of cases, the expediency and wisdom of which had obtained and been approved for more than a quarter of a century?

In Griswold v. McGee [102 Minn. 114], the court by main strength undertook to and did transfer an interest in property, valued at $20,000, the sole inheritance of a widow, to the purchaser of the husband's two-thirds interest, without a dollar of consideration or the shadow of right. The learned counsel say it was so ruled by the principle, if it be a principle, that the interest which a widow takes must be ascertained by the law of inheritance in force at the date of the husband's death. G. S. 1894, c. 45, as construed in Minnesota Debenture Co. v. Dean, 85 Minn. 473, seems to have vested the wife with a one-third future contingent interest in the real property of the husband upon marriage and seisin. In deciding the cause, all but the last twenty lines of the opinion is an effort to show that, prior to the death of the husband, the wife had no vested interest in his real property and, therefore, the interest she had been held to have was subject to being taken away by the legislature. The opinion cites case after case as authority upon this proposition, but examination shows that they have but slight reference, if any, to it. The question had never before been squarely presented for consideration. The ultimate legal fact had always been assumed rather than decided. While pretending to treat the question at great length and exhaustively, the statute defining what an interest in real property is or may be, is not referred to. The case last cited, construing the statute by parity of reasoning and analogy favorably to respondent's contention, goes unnoticed. In this portion of the opinion the respondent acquiesced because of the absence of former explicit decisions ruling the point. But in order to give the land to the execution purchaser, the court had to go farther. The execution sale

was made in 1893. It did not when made divest or affect the interest of the wife, whether such interest was then vested or wholly contingent. The supreme court had said so repeatedly before the sale, and reaffirmed it after the sale. By the act of 1901 the legislature said to the wife that unless her interest had been so divested, she should have it upon the death of her husband. The husband died, and then in the decision complained of the court say that what the legislature intended was that the prior execution sale did divest the wife's interest, notwithstanding the former and repeated rulings of the court that it did not. The language of the act is not susceptible of such construction. The legislature was impotent to pass such an act. A carload of authorities are available and can be assembled so holding. A fair construction of the language in no manner implies that the legislature so intended. It is a travesty upon the rules of construction to so hold. The court gave the act of 1901 retroactive application. The former decisions of the state are uniform and massive upon the proposition that a statute shall not be retroactively applied, particularly where in so doing a wrong will be inflicted. By its decision has the court provoked a difference of opinion between it and the attorney or has it gone to war with its own decisions which had become settled rules of property throughout the state?

BROOKS, Special Chief Justice.[2]

This is an original proceeding in this court to remove the accused, Francis B. Hart, from his office as an attorney at law, instituted upon the verified accusation of the secretary of the state board of law examiners. Such accusation being filed and an order made thereon requiring the accused to appear and answer, the justices of this court deemed themselves disqualified to hear and determine the case, whereupon the governor, at their request and pursuant to section 3 of article 6 of the constitution, assigned five judges of the district court to sit

---

[2] For the purpose of hearing and determining this matter the governor assigned the following judges of the district court, viz.: Hon. Frank C. Brooks, of the Fourth district, to sit in place of the chief justice; Hon. Hascal R. Brill of the Second district; Hon. Myron D. Taylor of the Seventh district; Hon. W. S. McClenahan of the Fifteenth district; and Hon. Nathan Kingsley, of the Tenth district.

therein in their place. The accused appeared before the judges so appointed, and, his objection to the sufficiency of the accusation being first overruled, thereupon denied its truth. A referee was named to take and report the evidence to this court, and upon his report and the oral arguments and briefs the matter was submitted.

The accusation sets forth facts which are admitted, and are therefore found to be true, as follows: That the accused is, and for many years has been, an attorney of this court, and that on or about December 7, 1907, he composed two certain letters, one of which he addressed and sent to the chief justice, by his name and title, and the other to the governor of this state. The first referred to three specified actions tried in certain courts and appealed therefrom, and to decisions of this court therein, in each of which the accused was counsel for the party ultimately defeated; and the letter to the governor suggested the impeachment of the justices because of their participation in the decisions so rendered. Before this the accused proffered the letter to the chief justice to the editor of the Minneapolis Journal, who was unwilling to publish it. About the same time he gave copies of both letters to the editor of the St. Paul Dispatch in which they were in large part published, and through whose manager they were furnished to the Associated Press, and thereupon published, in whole or in part, by various newspapers in this and other states. The cases and decisions referred to in the letter to the chief justice are the following: Minneapolis Trust Company v. Menage, reported (1) in 73 Minn. 441, 76 N. W. 195; (2) 81 Minn. 186, 83 N. W. 481; (3) 86 Minn. 1, 90 N. W. 3; Ahern v. Hindman, 101 Minn. 34, 111 N. W. 734; and Griswold v. McGee, 102 Minn. 114, 112 N. W. 1020, 113 N. W. 382. This letter in its entirety covers thirty one pages of the printed record; and to the proper understanding of those parts which will be quoted, it may be stated that the case last mentioned involved the rights of a surviving widow in the estate of her deceased husband.

Addressing the chief justice, the accused wrote:

"Sir: The organic law creating the tribunal over which you now preside renders its constituent membership immune from civil liability for any erroneous decision officially made, even though it be corrupt. The sole remedy is by impeachment. Preliminary to moving articles, I submit three specifications. They are selected as fair samples of

what the court has now and then done and is doing, and not because they stand alone, or are worse than others."

Then follows what purports to be a detailed history of the three causes and the disposition thereof in this court, interspersed with much offensive matter, the most conspicious of which is the following, concerning the opinion of this court in the Griswold case:

"You assigned it [the property involved] to one who has no better right to it than the burglar to his plunder. It seems like robbing a widow to reward a fraud, with the court acting as a fence, or umpire, watchful and vigilant that the widow get no undue advantage. * * * The point is this: Is a proper motive for the decision discoverable short of assigning to the court emasculated intelligence, or a constipation of morals and faithlessness to duty? If the state bar association, or a committee chosen from its ranks, or the faculty of the University law school, aided by the researches of its hundreds of bright, active students, or if any member of the court, or any other person, can formulate a statement of a correct motive for the decision, which shall not require fumigation before it is stated, and quarantine after it is made, it will gratify every right-minded citizen of the state to read it."

The letter to the governor contains the following:

"If [the decisions mentioned are] not right, is it possible in the making of them for the court to have been honestly wrong? * * * It goes to the integrity and stability of the state if the members of the court cannot be 'men learned in the law,' as required by the constitution, or honest, as required by good morals; and, if there exist good prima facie reasons for challenging them in either regard, the matter should receive prompt attention. * * * If no proper motive for the decisions can be gathered from the decisions themselves, it seems to me that impeachment would be proper, leaving the Senate free to make inquiry as to motive outside of the decisions, and I am constrained to think that not a little evidence can be adduced relevant thereto."

In justification for the acts of the accused, above detailed, nothing is proven, except only the decisions in question and the records of this court with respect thereto. And nowhere in either letter is there any suggestion that their author had been counsel for the defeated party in any of the actions mentioned—no indication that he was suffering from the sting of disappointment, and for that reason necessarily and

inevitably biased, and, it might be, revengeful, because of his defeat. The statement, in one letter, that the decisions had been "selected as fair samples," was calculated, and was perhaps intended, to mislead the public in this regard; and we are satisfied, and find, that these letters were not composed or published with the expectation that any official action should be based thereon, and that the letter first mentioned was so sent to the chief justice for the purpose of insulting him and the other justices of this court.

The first opinion in the Menage case, of which the accused complains, and the one determinative of the controversy, was that reported in 81 Minn. 186, 83 N. W. 481. That opinion announced the law of the case, followed in the lower court upon the last trial and in the final appeal. It was rendered August 8, 1900, upwards of seven years before the publication of these letters. The chief justice whose impeachment is now proposed dissented. Two of the concurring justices have retired from the bench. The remaining two have since been re-elected. Four legislatures convened and adjourned before it occurred to the accused to suggest that any of the justices had been guilty of any impeachable offense.

In the Ahern case the court held that no cause of action had been either alleged or proven in the court below; and, as this court had done in scores of previous cases (but as the accused asserts it should not have done), it thereupon proceeded to refute the reasons assigned for a contrary conclusion in the trial court's memorandum, not made a part of the order appealed from. It did not hold that a right decision was vitiated on account of an erroneous reason for it, but held that a wrong decision could not be sustained because of an insufficient reason therefor so stated.

In the Griswold case the court announced the well-established doctrine that the right of a widow in her deceased husband's estate is governed by the law as it exists at the time of his death, and that a wife during her husband's lifetime has no vested right to any of his property of which she cannot be deprived by legislative enactment. At the time of Griswold's death the statute provided that, if his title to any property had been previously divested by execution sale, the widow could claim no interest therein; and it was accordingly held that her asserted claim to the land in question was without validity.

Inasmuch as the accused himself has said that "the sharp, focal point of the letter" is the decision in the Griswold case, we take occasion to say that, so far as we are advised, its correctness in point of law has never been elsewhere questioned.  Certain it is that no unbiased mind can find in these records or decisions any pretense of an excuse for the many insulting insinuations and statements with which these letters abound.  Each letter was a gross libel upon the justices referred to, but each was composed and published long after the final determination of the causes in which the decisions complained of were written; and the case against the accused is, as we conclude, divisible into two distinct elements, governed by wholly different principles: (1) The publication of the letter thus addressed to the governor, and of the matter contained in the body of the other; (2) the addressing and sending of such other letter to the chief justice.

1.  Our Revised Laws of 1905 provide (section 2679, subd. 9) that an attorney, when admitted to practice, shall take an oath that he will conduct himself "as an attorney and counselor at law in an upright and courteous manner," to the best of his learning and ability, "with all good fidelity as well to the court as to the client"; (section 2281) that every attorney shall "observe and carry out the terms of his oath," and "maintain the respect due to courts of justice and judicial officers"; and (section 2290) that "an attorney at law may be removed or suspended by the supreme court for any * * * wilful misconduct in his profession" or "for a wilful violation of his oath, or of any duty imposed upon an attorney by law."  These quoted words contain all of the statutes cited or relied upon by counsel for the prosecution. And no doubt they are declaratory of the common law and in harmony with the statutes of our sister states.

The courts are not agreed as to whether an attorney can be removed from office on other than statutory grounds.  But, inasmuch as good moral character is a prerequisite to admission, it is generally, and perhaps everywhere, held that an attorney may forfeit his office by such misconduct, professional or nonprofessional, as clearly shows that he is unfit to be an attorney or to associate with honest men.  It has been held in some cases that such unfitness may be established by proof of one specific act of misconduct; and it may be (although we do not so decide) that a libelous publication by an attorney, directed against a

judicial officer, could be so vile and base and of such a nature as to justify the disbarment of its author. This was the rule applied in State v. McClaugherty, 33 W. Va. 250, 10 S. E. 407, a case greatly relied upon by the prosecution. That cause came before the court upon appeal, and involved only the right of an attorney to practice in the inferior court from which the appeal was taken. It was held that the libel published by the accused and referring to the judge evidenced such a "degree of turpitude and depravity" on the part of the attorney that the court might remove him, and, having in its discretion done so, the appellate court "ought not to reverse its action." It was expressly and in so many words held (page 255 of 33 W. Va., and page 408 of 10 S. E.) that "the misbehavior was not that of an officer of the court in his official capacity, but of an individual in his private character."

We are not prepared to say that the acts charged against the accused bring him within the rule so applied. The letters in question, though very reprehensible, in their reference to the court express upon their face merely the personal opinion of the accused. They charge nothing against it, other than an asserted disregard of legal principles, with unwarranted deductions therefrom as to its motives. Furthermore, the disbarment of the accused is sought for professional delinquency alone. The ground stated is a violation by him of his duty to "observe and carry out the terms of his oath" and to "maintain the respect due to courts of justice and judicial officers"; and the question presented is how far the accused in what he did acted in a professional or in a private capacity.

It must be conceded that the letters constituted no part of the proceedings in any cause. The accused in what he did represented no client, and this case in this respect is distinguishable from those in which insulting or scandalous words concerning a judge were spoken or written by the attorney in a strictly professional capacity in an action in court, upon a trial, or in some paper pertaining thereto. Such cases have arisen, some of which are cited by the prosecution, in which the libelous or scandalous matter concerning one or more judges, constituting the basis of the charge, was made a part of a brief, as in U. S. v. Green (C. C.) 85 Fed. 857, and In re Philbrook, 105 Cal. 471, 38 Pac. 511, 884, 45 Am. St. 59; a pleading, as in People v. Brown, 17 Colo. 431, 30 Pac. 338, and In re Snow, 27 Utah, 265, 75 Pac. 741;

104 M.—8

a petition for a rehearing, as In re Woolley, 11 Bush, 95, and In re Robinson (Wash.) 92 Pac. 929; or an affidavit in a cause, as In re Murray, 58 Hun, 604, 11 N. Y. Supp. 336. Of like nature, also, is In re Breen (Nev.) 93 Pac. 997, in which a judge of the district court was disbarred for having stated in his court that a certain opinion of the supreme court was an "abnormally strange document," which was "reprehensible" only in the event "the court knew what it was doing," and otherwise "pitiful," and In re Maestretti (Nev.) 93 Pac. 1004, in which the prosecuting attorney before the district court made contemptuous remarks concerning the same opinion.

The appeals referred to by the accused having been fully disposed of when the letters were written, this case is also unlike those in which the libel or slander tended and was designed to influence the judge in some matter still pending. Such a case was Ex parte Cole, 1 McCrary, 405, Fed. Cas. No. 2,973, in which the attorney was charged with inciting newspaper publications disparaging the court, with intent to intimidate the judge in a pending suit. Such also was the case of In re Collins, 147 Cal. 8, 81 Pac. 220, in which the attorney undertook, as in this case, to prefer charges with the governor, but, unlike the accused here, caused to be published false charges against the judge "to influence his action or discredit his proceedings" in a matter still undetermined. Such publications, by whomsoever made, having reference to a particular case pending, and tending to prejudice the decision therein, are punishable summarily; and in the application of this principle an action is pending upon an appeal so long as a motion for a rehearing is permissible therein. State v. Tugwell, 19 Wash. 238, 52 Pac. 1056, 43 L. R. A. 717; People v. News-Times Pub. Co., 35 Colo. 253, 84 Pac. 912; In re Chadwick, 109 Mich. 588, 67 N. W. 1071; State v. Shepherd, 177 Mo. 205, 76 S. W. 79, 99 Am. St. 624. In this respect the matter before us differs from cases cited in the brief of the prosecution. In State v. McClaugherty, supra, the libel for which the attorney was disbarred had reference to the conduct of the court as to indictments not yet disposed of. In In re Brown, 3 Wyo. 121, 4 Pac. 1085, the words were uttered on the very day the opinion which called them forth was handed down, evidently before entry of judgment, and while a petition for a rehearing was allowable. We have, indeed, found no case, federal or state, in which an attorney was dis-

barred or suspended for any utterance written or spoken concerning a decision or ruling of a judge in a cause after its final determination and not addressed to the judge in person. Previous nonexercise of such power might well indicate its nonexistence.

. The great weight of authority, moreover, upholds the doctrine that every citizen has the unrestricted right to comment upon and criticise such rulings of the court (after the litigation is concluded), subject only to liability therefor in a criminal or civil action triable by a jury. A few courts adhere to the ancient common-law doctrine that criticism of a judicial officer, even though made after the determination of the cause, may constitute contempt of court. Such was the holding in State v. Morrill, 16 Ark. 384, and Burdett's Case, 103 Va. 838, 48 S. E. 878, 68 L. R. A. 251, 106 Am. St. 916. The law is so stated also in In re Chadwick, supra, and in State v. Shepherd, supra, though in each of these the statements were obiter, inasmuch as the publications complained of therein had reference to rulings in actions not finally determined on appeal. But these rulings are exceptional. In England, summary punishments for what Lord Hardwicke called "scandalizing the court itself" have become obsolete. There, as elsewhere, "courts are satisfied to leave to public opinion attacks or comments derogatory or scandalous to them." McLeod v. St. Aubyn, 68 Law J. P. C. 137, 143; 1899 App. Cas. 549, 561. This, also, "may be considered the American doctrine." Ex parte Green, 46 Tex. Crim. 576, 81 S. W. 723, 725, 66 L. R. A. 727. In the terse, but comprehensive, language of Mr. Justice Holmes: "When a case is finished, courts are subject to the same criticism as other people." Patterson v. Colorado, 205 U. S. 454, 463, 27 Sup. Ct. 556, 51 L. Ed. 879.

In this connection the rule and the reasons for it, as stated by other courts, are worthy of repetition. It was said by Wright, C. J. in State v. Dunham, 6 Iowa, 245, 256, 257: "When a case is disposed of, and the decision announced, such decision becomes public property, * * * subject to public scrutiny and investigation. In such cases, it is perfectly competent and lawful for any one to comment upon the decision, and expose its errors and inconsistencies. * * * And should those thus commenting, leave the subject, and impute dishonesty and base motives to the judge, he may be punished by indictment for a libel—he may be answerable in damages in a civil action—or he may

be liable to both prosecutions." In State v. Tugwell, 19 Wash. 256, 52 Pac. 1062, 43 L. R. A. 717, the court, holding that a libel prejudicial to pending litigation constitutes a contempt of court, was careful, also, to add: "It is not intended to intimate or suggest that any citizen of the state has not a legal right to comment upon, criticise and freely and without restriction from any lawful authority discuss any cause determined by any of the courts of this state after the final disposition of such case." In State v. Kaiser, 20 Ore. 50, 57, 23 Pac. 964, 8 L. R. A. 584, the court held that it had no inherent authority to "punish any one for criticising the court on account of its procedure in matters which have fully terminated, however much its dignity and standing may be affected thereby, however unjust, rude or boorish may be the criticism, or whatever may be its effect in bringing the administration of the law into disrepute." And in State v. Bee Pub. Co., 60 Neb. 282, 296, 83 N. W. 204, 50 L. R. A. 195, 83 Am. St. 531, the court, referring to its rulings in causes concluded, says: "Our decisions and all our official actions are public property, and the press and the people have the undoubted right to comment on them and criticise and censure them as they see fit. Judicial officers, like other public servants, must answer for their official actions before the chancery of public opinion."

In State v. Circuit Court, 97 Wis. 1, 72 N. W. 193, 38 L. R. A. 554, 65 Am. St. 90, the circuit judge was forbidden by writ of prohibition from punishing summarily the petitioners (one of whom was an attorney) for a publication charging him with being influenced by corrupt motives, which had reference to "proceedings in cases already heard and decided, and not to matters then pending or on trial." In its opinion granting the writ, the court said (page 12 of 97 Wis., page 196 of 72 N. W. [38 L. R. A. 554, 65 Am. St. 90]): "Important as it is that courts should perform their grave public duties unimpeded and unprejudiced by illegitimate influences, there are other rights guaranteed to all citizens by our constitution and form of government, either expressly or impliedly, which are fully as important, and which must be guarded with an equally jealous care. These rights are the right of free speech and of free publication of the citizen's sentiments 'on all subjects.'"

In all the federal courts the law is, as above stated, made so by act of congress, in its original form passed March 2, 1831 [4 Stat. 487, c. 99]. The legislation was induced by the acquittal of United States District Judge Peck, of Missouri, when impeached for having imprisoned an attorney for criticising one of his decisions after the cause was ended. The act was drawn by James Buchanan, who was one of the managers of the impeachment. Such is the history of the legislation as detailed in a learned opinion by Judge Thomas G. Jones of Alabama, in Ex parte McLeod (D. C.) 120 Fed. 130, in which it is said page 136): "Such criticism is the right of the citizen, and essential not only to the proper administration of justice, but to the public tranquility and contentment. Withdrawing power from courts to summarily interfere with such exercise of the right of the press and freedom of speech deprives them of no useful power." The following decisions are also cited as enunciating the same principle: Rex v. Charlier (1903) Rap. Jud. Quebec, 12 B. R. 385; State v. Sweetland, 3 S. D. 503, 54 N. W. 415; State v. Anderson, 40 Iowa, 207; Field v. Thornell, 106 Iowa, 15, 75 N. W. 685, 68 Am. St. 281; Cheadle v. State, 110 Ind. 301, 11 N. E. 426, 59 Am. 199; People v. Wilson, 64 Ill. 195, 16 Am. 528; Storey v. People, 79 Ill. 45, 22 Am. 158; Post v. State, 14 Ohio C. C. 111; Percival v. State, 45 Neb. 741, 64 N. W. 221, 50 Am. St. 568; Rosewater v. State, 47 Neb. 630, 66 N. W. 640; In re Dalton, 46 Kan. 253, 26 Pac. 673; In re Robinson, 117 N. C. 533, 23 S. E. 453, 53 Am. St. 596; In re Cooke, 116 La. 723, 41 South. 49; Ex parte Steinman and Hensel, 95 Pa. 220, 40 Am. 637; Sturoc's Case, 48 N. H. 428, 432, 97 Am. Dec. 626.

Every newspaper proprietor within the state, and every other citizen therein, in his capacity as such, might therefore, as we hold, have written and published the letter of the accused to the governor, and the matter contained in the body of the letter to the chief justice, and not be answerable for so doing, otherwise than in an action triable by a jury of his peers; and though one became an attorney, he still retains his rights as a citizen and a freeman. "Fidelity to the court," as was said in the Pennsylvania case above cited, "involves many particulars, but they all evidently concern his official relations." The attorney is bound to render to the court the respect which is its "due" under the law. This is the full extent of his obligation. Notwithstanding his

oath, he may exercise his constitutional rights. No statute could have any validity which would undertake to impair or abridge them. He may sue a judge in his own behalf or for another, alleging every fact pertinent to the case, and not thereby fail in his professional duty. Nor is he "professionally answerable for a scutiny into the official conduct of the judges, which would not expose him to legal animadversion as a citizen." Austin's Case, 5 Rawle, 206, 28 Am. Dec. 657. Above all others, the members of the bar have the best opportunity to become conversant with the character and efficiency of our judges. No class is less likely to abuse the privilege, as no other class has as great an interest in the preservation of an able and upright bench. The rule contended for by the prosecution, if adopted in its entirety, would close the mouths of all those best able to give advice, who might deem it their duty to speak disparagingly. "Under such a rule," so far as the bar is concerned, "the merits of a sitting judge may be rehearsed, but as to his demerits there must be profound silence." State v. Circuit Court, supra.

Chief Justice Sharswood was not only a most eminent jurist, but was also in his day the very highest authority in all matters pertaining to professional ethics. "No class of the community," said he, in the Steinman-Hensel case, supra, "ought to be allowed freer scope in the expression or publication of opinions as to the capacity, impartiality, or integrity of judges than members of the bar. They have the best opportunities of observing and forming a correct judgment. They are in constant attendance on the courts. Hundreds of those who are called on to vote never enter a courthouse, or, if they do, it is only at intervals as jurors, witnesses, or parties. To say that an attorney can only act or speak on this subject under liability to be called to account, and to be deprived of his profession and livelihood, by the very judges whom he may consider it his duty to attack and expose, is a position too monstrous to be entertained for a moment under our present system." This language was not written because of any peculiar provision of the Pennsylvania constitution. It is applicable everywhere. And we adopt as our conclusion here these words of Justice Brewer: "After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consid-

er his rulings correct, his conduct proper, or even his integrity free from stain." In re Pryor, 18 Kan. 72, 76, 26 Am. 747.

In what we have said it is not our purpose to extenuate in the least the misbehavior of the accused. Few acts could be more disgraceful than the deliberate publication by an attorney capable of correct reasoning of such baseless insinuations. The case is of that sort which, considered of itself, might easily make bad law. But the question presented is vitally important to the entire bench and bar of the state, and even more so to its people, whose servants we are. It concerns not merely the power of the court to protect itself from undeserved censure, but involves in its determination that independence of the bar, upon the preservation of which civil liberty itself in large degree depends; and suspicion and distrust of the courts will not result from this ruling or its future application, as counsel for the prosecution predict. The people can be relied upon to discriminate, in the long run, between truth and falsehood; and the profession, from which our judges are chosen, taken as a whole, are always both eager and able to protect and defend the court when unjustly assailed. This very proceeding was instituted upon the suggestion of the state bar association, and one of its representatives assisted in its prosecution. Such misconduct, moreover, brings its own appropriate punishment. A lawyer, however eminent, ordinarily commits professional suicide when he undertakes to thus malign the highest court of the state. By so doing he almost inevitably lessens his influence and standing among his associates, and his clients quickly seek other counsel. We have not heard that the judiciary was discredited or dishonored in Pennsylvania because it was held there to be both "the right and the duty of a lawyer to bring to the notice of the people who elect the judges every instance of what he believes to be corruption," or in Wisconsin by the denial to its judiciary of that immunity from criticism asserted in State v. Circuit Court. And we have yet to learn that the federal courts or judges have failed to maintain their dignity or to retain the respect and confidence of the people because powerless since the act of March 2, 1831, to punish summarily those guilty of such utterances, not addressed to the judge in person. "Respect to courts cannot be compelled; it is the voluntary tribute of the public to worth, virtue, and intelligence, and, whilst they are found upon the judgment seat, so long, and no long-

er, will they retain the public confidence." Stuart v. People, 3 Scam. 395, 405.

2. The question remains whether the accused was guilty of professional misconduct in sending to the chief justice the letter addressed to him. This was done, as we have found, for the very purpose of insulting him and the other justices of this court; and the insult was so directed to the chief justice personally because of acts done by him and his associates in their official capacity. Such a communication, so made, could never subserve any good purpose. Its only effect in any case would be to gratify the spite of an angry attorney and humiliate the officers so assailed. It would not and could not ever enlighten the public in regard to their judicial capacity or integrity. Nor was it an exercise by the accused of any constitutional right, or of any privilege which any reputable attorney, uninfluenced by passion, could ever have any occasion or desire to assert. No judicial officer, with due regard to his position, can resent such an insult otherwise than by methods sanctioned by law; and for any words, oral or written, however abusive, vile, or indecent, addressed secretly to the judge alone, he can have no redress in any action triable by a jury. "The sending of a libelous communication or libelous matter to the person defamed does not constitute an actionable publication." 18 Am. & Eng. Enc. (2d Ed.) 1017. In these respects the sending by the accused of this letter to the chief justice was wholly different from his other acts charged in the accusation, and, as we have said, wholly different principles are applicable thereto.

The conduct of the accused was in every way discreditable; but, so far as he exercised the rights of a citizen, guaranteed by the constitution and sanctioned by considerations of public policy, to which reference has been made, he was immune, as we hold, from the penalty here sought to be enforced. To that extent his rights as a citizen were paramount to the obligation which he had assumed as an officer of this court. When, however, he proceeded to thus assail the chief justice personally, he exercised no right which the court can recognize, but, on the contrary, wilfully violated his obligation to maintain the respect due to courts and judicial officers. "This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and

offensive conduct toward the judges personally for their official acts." Bradley v. Fisher, 13 Wall. 335, 20 L. Ed. 646. And there appears to be no distinction, as regards the principle involved, between the indignity of an assault by an attorney upon a judge, induced by his official act, and a personal insult for like cause by written or spoken words addressed to the judge in his chambers or at his home or elsewhere. Either act constitutes misconduct wholly different from criticism of judicial acts addressed or spoken to others. The distinction made is, we think, entirely logical and well sustained by authority. It was recognized in Ex parte McLeod, supra. While the court in that case, as has been shown, fully sustained the right of a citizen to criticise rulings of the court in actions which are ended, it held that one might be summarily punished for assaulting a judicial officer, in that case a commissioner of the court, for his rulings in a cause wholly concluded. "Is it in the power of any person," said the court, "by insulting or assaulting the judge because of official acts, if only the assailant restrains his passion until the judge leaves the court building, to compel the judge to forfeit either his own self-respect and the regard of the people by tame submission to the indignity, or else set in his own person the evil example of punishing the insult by taking the law into his own hands? * * * No high-minded, manly man would hold judicial office under such conditions."

That a communication such as this, addressed to the judge personally, constitutes professional delinquency for which a professional punishment may be imposed, has been directly decided. "An attorney who, after being defeated in a cause, writes a personal letter to the trial justice complaining of his conduct and reflecting upon his integrity as a justice, is guilty of misconduct and will be disciplined by the court." Matter of Manheim, 113 App. Div. 136, 99 N. Y. Supp. 87. The same is held in In re Griffin, 1 N. Y. Supp. 7, and in In re Wilkes, 3 N. Y. Supp. 753. In the latter case it appeared that the accused attorney had addressed a sealed letter to a justice of the city court of New York, in which it was stated, in reference to his decision: "It is not law; neither is it common sense. The result is, I have been robbed of $80." And it was decided that, while such misconduct was not a contempt under the statute, the matter should be "called to the attention of the supreme court which has power to discipline the attorney." "If," says

the court, "counsel, learned in the law, are permitted, by writings leveled at the heads of judges, to charge them with ignorance, with unjust rulings, and with robbery, either as principals or accessories, it will not be long before the general public may feel that they may redress their fancied grievances in like manner, and thus the lot of a judge will be anything but a happy one, and the administration of justice will fall into bad repute."

The recent case of Johnson v. State (Ala.) 44 South. 671, was in this respect much the same as the case at bar. The accused, an attorney at law, wrote and mailed a letter to the circuit judge, which the latter received by due course of mail, at his home, while not holding court, and which referred in insulting terms to the conduct of the judge in a cause wherein the accused had been one of the attorneys. For this it was held that the attorney was rightly disbarred in having "wilfully failed to maintain the respect due to him [the judge] as a judicial officer, and thereby breached his oath as an attorney." As recognizing the same principle, and in support of its application to the facts of this case, we cite the following: Ex parte Bradley, 7 Wall. 364, 19 L. Ed. 214; Beene v. State, 22 Ark. 149; Com. v. Dandridge, 2 Va. Cas. 408; People v. Green, 7 Colo. 237, 244, 3 Pac. 65, 374, 49 Am. 351; Smith's Appeal, 179 Pa. St. 14, 36 Atl. 134; Scouten's Appeal, 186 Pa. St. 270, 40 Atl. 481.

Our conclusion is that the charges against the accused have been so far sustained as to make it our duty to impose such a penalty as may be a sufficient lesson to him and a suitable warning to others. In this we put aside the letter to the governor and the publication in the newspapers, and consider only the misconduct of the accused, wherein, as we hold, he was guilty of professional delinquency. He is a practitioner well advanced in life, of an age when it is hardly possible to adapt one's self to a new calling. Perpetual disbarment would be to him a punishment of the severest character. It might take from him his only source of income. So far as we are advised, he has not on any previous occasion shown like disrespect to the courts; and we are not unmindful of the rule that such disbarment should not be inflicted arbitrarily or "unless," as was said in Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552, "absolutely necessary to protect the

court and the public from one shown * * * to be unfit to be a member of an honorable profession."

It is the judgment of the court that the accused be suspended from practicing as an attorney and counselor at law in any of the courts of this state for the period of six months.

Let judgment be entered accordingly.